[Cite as *In re B.R.*, 2019-Ohio-644.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

|  |  |  |
|---|---|---|
| IN RE: B.R. | : | Appellate Case No. 28182 |
|  | : |  |
|  | : | Trial Court Case No. 2015-3158 |
|  | : |  |
|  | : | (Appeal from Common Pleas Court – |
|  | : | Juvenile Division) |
|  | : |  |

. . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of February, 2019.

. . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Atty. Reg. No. 0095826, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee,

KELLY M. SCHROEDER, Atty. Reg. No. 0080637, One South Main Street, Suite 1800, Dayton, Ohio 45402
    Attorney for Defendant-Appellant, Mother

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Mother appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which granted permanent custody of her nine-year-old son, B.R., to the Montgomery County Department of Job and Family Services, Children Services Division (MCCS).[1] For the following reasons, the juvenile court's judgment will be affirmed.

## I. Procedural History

{¶ 2} MCCS began working with Mother in January 2015 after Mother made threats against several people. Mother signed a case plan in February 2015 that included requirements that Mother obtain stable housing and mental health treatment. B.R. and his younger sibling stayed with Grandmother.[2] Due to ongoing concerns, in May 2015, MCCS filed a complaint, alleging that B.R. was neglected and dependent. In June 2015, after a hearing before a magistrate, the juvenile court granted interim temporary custody of B.R. to Grandmother. After a second hearing on August 6, 2015, the magistrate granted temporary custody to Grandmother.

{¶ 3} In March 2016, MCCS moved for the juvenile court to grant legal custody of B.R. to Grandmother. The motion and accompanying affidavit indicated that Mother had not completed the mental health and substance abuse assessments requirements in her case plan, that Mother had recently used marijuana, that Mother had quit her job and had no verifiable income, that Mother had stable housing from October 2015 through February

---

[1] Father's parental rights also were terminated. However, Father is not a party to this appeal.

[2] B.R. has a younger brother, L.P., who is four years younger than B.R. This appeal concerns only B.R.

2016, but had recently moved to Youngstown, and that Mother had not visited with B.R. The juvenile court held a hearing on the motion on July 8, 2016. The same day, the juvenile court denied the motion for legal custody to Grandmother and, instead, granted a first extension of temporary custody to her.

{¶ 4} On September 29, 2016, MCCS again filed a motion for legal custody of B.R. to Grandmother. That motion was later withdrawn.

{¶ 5} On November 18, 2016, MCCS filed a motion for a second extension of temporary custody with custody to be given to non-relative James Lacey (who had been babysitting B.R. for days at a time) or, in the alternative, MCCS. The motion indicated that Grandmother had permitted Mother to take B.R. and his sibling unsupervised to Missouri and that Grandmother had recently married a registered sex offender with several convictions related to sexual conduct with minors. Grandmother had reported that she was no longer able to care for the children, and the children had been placed with Lacey. In December 2016, after a hearing, the juvenile court granted interim temporary custody of B.R. to Lacey.

{¶ 6} A dispositional hearing on the motion for a second extension of temporary custody was held on January 25, 2017. The juvenile court granted a second extension of temporary custody to Lacey; B.R.'s parents were granted supervised visitation. The second extension of temporary custody was to expire on May 23, 2017.

{¶ 7} On April 5, 2017, MCCS filed a motion for legal custody of B.R. to Lacey. The magistrate scheduled a dispositional hearing for June 5, 2017. By June 5, however, Lacey was no longer willing to provide care for B.R. due to concerns about the safety of other children in his home. The court, therefore, continued that matter until August 31,

2017, and indicated that MCCS would need to file a new motion requesting custody to MCCS.

**{¶ 8}** On June 7, 2017, MCCS filed a motion for interim temporary custody to MCCS. On June 9, 2017, after an ex parte hearing, the juvenile court granted the motion and terminated the temporary legal custody to Lacey. The dispositional hearing on MCCS's motion was set for August 31, 2017.

**{¶ 9}** On August 9, 2017, MCCS moved for permanent custody of B.R. The magistrate held a hearing on the motion on August 31, 2017, during which Mother was present with counsel. The day of the hearing, Mother's counsel informed the court that she had not received certain medical records from B.R.'s therapist, as requested in discovery. The magistrate ordered MCCS to provide the therapist's report and other counseling records, and it granted a recess to allow Mother's counsel to review the documents.

**{¶ 10}** On September 21, 2017, the magistrate filed a lengthy decision granting permanent custody to MCCS. Mother objected to the magistrate's decision, and she requested the preparation of a transcript and the appointment of a new attorney.

**{¶ 11}** On February 20, 2018, Mother, with new counsel, filed supplemental objections. She asserted that the magistrate's grant of permanent custody to MCCS was against the manifest weight of the evidence, that the magistrate erred in allowing the therapist to testify, that Mother's lack of income was not proven, and that the magistrate failed to consider all of the best-interest factors. MCCS opposed the objections.

**{¶ 12}** On September 25, 2018, in a 19-page decision, the juvenile court overruled Mother's objections and granted permanent custody of B.R. to MCCS.

{¶ 13} Mother appeals from the juvenile court's ruling, raising two assignments of error. First, she claims that the juvenile court's decision granting permanent custody to MCCS was "not in accordance with R.C. 2151.414, was not in the child's best interest, and was against the manifest weight of the evidence." Second, she claims that the juvenile court erred in granting permanent custody to MCCS, because "MCCS failed to file its motion for permanent custody within the time constraints of R.C. 2151.415(A) and Juvenile Rule 14." As part of her second assignment of error, Mother also claims that she was prejudiced by MCCS's discovery violation related to B.R.'s therapy records. We will address Mother's claims in reverse order.

## II. Timeliness of MCCS's Motion for Permanent Custody

{¶ 14} In her second assignment of error, Mother claims that the juvenile court committed prejudicial error by granting MCCS's motion for permanent custody when MCCS failed to file its motion within the time requirements of R.C. 2151.415(A) and Juv.R.14.

{¶ 15} R.C. 2151.415(A) provides, in relevant part:

* * * [A] public children services agency * * * that has been given temporary custody of a child pursuant to section 2151.353 of the Revised Code, not later than thirty days prior to the earlier of the date for the termination of the custody order pursuant to division (H) of section 2151.353 of the Revised Code or *the date set at the dispositional hearing for the hearing to be held pursuant to this section*, shall file a motion with the court that issued the order of disposition requesting that any of the following orders of disposition of the child be issued by the court:

* * *

(4) An order permanently terminating the parental rights of the child's parents[.]

(Emphasis added.) *See also* Juv.R. 14(A), which contains language similar to R.C. 2151.415(A).

**{¶ 16}** MCCS states that a dispositional hearing on its motion for temporary custody was set for August 31, 2017, and that it, consequently, was required to file its motion for permanent custody no later than July 31, 2017.[3] MCCS concedes that its motion was not timely filed but argues that no prejudicial error resulted from its actions. MCCS notes that Mother did not raise a timeliness issue either at the August 31, 2017 hearing or in her objections to the magistrate's decision.

**{¶ 17}** Juv.R. 40(D)(3)(b)(iv) provides that "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Juv.R. 40(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b)." "The purpose behind the appellate waiver rule is to ensure that the trial judge shall have an opportunity to correct any errors occurring in the trial judge's court, the only exception being for plain error." *In re M.G. and C.G.*, 2d Dist. Miami No. 07-CA-6, 2007-Ohio-3589, ¶ 15. "Thus, the failure to file objections waives the right to appellate review and precludes relief from this court in the absence of civil plain error." *In re A.P.*, 2d Dist. Montgomery No. 28023, 2019-Ohio-139, ¶ 10, citing *In re Etter*, 134 Ohio App.3d 484, 731 N.E.2d 694 (1st Dist.1998).

**{¶ 18}** "[I]n appeals of civil cases, the plain error doctrine is not favored and may

---

[3] Thirty days prior to August 31, 2017 would be August 1, 2017, not July 31, 2017.

be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *In re A.J.S.*, 2d Dist. Miami No. 2007 CA 2, 2007-Ohio-3433, ¶ 16, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), syllabus.

**{¶ 19}** Mother did not challenge the untimeliness of MCCS's motion for permanent custody before the magistrate or in her objections to the magistrate's ruling granting permanent custody of B.R. to MCCS. Accordingly, she has waived all but plain error.

**{¶ 20}** We find no plain error in the juvenile court's consideration of MCCS's untimely motion for permanent custody. At the outset, MCCS's failure to file a timely motion for permanent custody did not divest the juvenile court of jurisdiction to address the motion. *See In re Young*, 76 Ohio St.3d 632, 669 N.E.2d 1140 (1996). In *In re Young*, the Ohio Supreme Court held that, pursuant to R.C. 2151.353, a juvenile court has jurisdiction to make a dispositional order after the statutory "sunset date" of a temporary custody order, even though the children services agency failed to filed a motion pursuant to R.C. 2151.415(A). *Id.* at 637. The court explained:

> This holding allows the juvenile court to assess each situation on its merits and does not mandate the return of children to a situation from which they originally needed protection solely because the agency charged with their care missed a filing deadline. Thus, we hold that when the sunset date has passed without a filing pursuant to R.C. 2151.415 and the problems that led to the original grant of temporary custody have not been

resolved or sufficiently mitigated, courts have the discretion to make a dispositional order in the best interests of the child. Where the original problems have been resolved or sufficiently mitigated, courts may not make further dispositional orders based on the original complaint.

*Id.* at 638. The supreme court cautioned, however, that the filings deadlines were not meaningless. It stated:

That juvenile courts have continuing jurisdiction does not mean that public children services agencies or private child-placing agencies can ignore the mandates of the statute and rely on the court to save them from their own failures or oversights. Neither does it mean that courts can grant dispositional orders indiscriminately. The obligation to file a motion thirty days prior to the sunset date is not vitiated and the failure to file is not harmless error. *See Endsley v. Endsley* (1993), 89 Ohio App.3d 306, 624 N.E.2d 270. Accordingly, although the court has continuing jurisdiction, temporary custody terminates when the sunset date passes without a filing pursuant to R.C. 2151.415(A). However, because the court retains jurisdiction over the child, it may make further dispositional orders as it deems necessary to protect the child. We believe the General Assembly granted continuing jurisdiction to the courts for just this reason.

*Id.*

**{¶ 21}** Here, B.R. had been placed with his grandmother until November 2016 and then with Lacey until May 2017. MCCS obtained interim temporary custody of B.R. on June 9, 2017, after Lacey indicated that he was no longer able to care for the child. A

dispositional hearing was scheduled for August 31, 2017 on the motion for temporary custody. Upon the filing of MCCS's motion for permanent custody on August 9, 2017, the juvenile court promptly appointed new counsel for Mother on August 10, 2017, and Mother's counsel submitted a discovery request the same day. MCCS filed its witness list on August 11, 2017. MCCS's motion for permanent custody was not filed at least 30 days before the August 31 hearing date, but there is no evidence that Mother lacked adequate notice of the hearing date or of the permanent custody motion or that she was unable to prepare adequately for the August 31, 2017 hearing. Mother made no objection when MCCS indicated at the August 31, 2017 hearing that it would proceed on the motion for permanent custody and withdraw its motion for temporary custody.

{¶ 22} Mother argues that she was prejudiced by the untimeliness of MCCS's motion for permanent custody, because she did not receive complete discovery from MCCS, namely certain medical records. Mother argues that "MCCS's failure to abide by the time constraints made it impossible for Mother's attorney to obtain or move to compel key documents regarding the Child's therapeutic records."

{¶ 23} During the pre-trial portion of the August 31, 2017 hearing, Mother's counsel informed the juvenile court that she had received a discovery packet from the prosecutor's office, but it did not include any of the records from SAFY, the Flexman Clinic, or Adolescent Oasis, all of which were therapeutic records for B.R. Counsel stated that she had called the prosecutor a week before the hearing to ask for those records, but she had not received them. Counsel noted that the SAFY counselor was listed as a witness, and she stated that she could not adequately cross-examine the counselor without the records.

{¶ 24} When asked by the court if the prosecutor had any SAFY records, the prosecutor responded, "I do not have any SAFY records, Your Honor. I have only touched base with Jaime, the therapist, via telephone conversation and had conversations in regards to [the child's] therapy. I do not have any records. Additionally, the Flexman Institute records that [Mother's counsel] is referring to, that was just sent to the caseworker yesterday. The caseworker has not provided me – did not provide me with the copy of the Flexman Institute, nor was I planning on introducing that evidence." (Tr. at 7.)

{¶ 25} The court told the prosecutor that she had to make a copy of the Flexman records for Mother's counsel, since those records were requested by Mother. Mother's counsel then noted that MCCS apparently also had records from Adolescent Oasis and SAFY. The juvenile court admonished the prosecutor that she was required to ask her client (MCCS) if it had those records and, if it did, to present those records to opposing counsel. The court continued, "You cannot just count on your client having the records and not – giving them to you. That isn't – that isn't appropriate." (Tr. at 8.) The court ordered a recess so that all of the therapeutic records in MCCS's possession could be copied and provided to Mother's counsel.

{¶ 26} While the record reflects that MCCS did not provide complete discovery to Mother prior to the August 31, 2017 hearing, the juvenile court addressed the issue by ordering the State to provide certain records to Mother prior to the hearing and by granting a recess so that Mother could review the therapist's summary report, which was four pages in length, and other records. Mother did not ask for a continuance of the hearing before or after receipt of the records. From this record, we cannot conclude that the

untimely filing of MCCS's motion for permanent custody prejudiced Mother or that the juvenile court committed plain error when it addressed MCCS's motion for permanent custody.

{¶ 27} Mother's second assignment of error is overruled.

### III. Standards for Motion for Permanent Custody

{¶ 28} In Ohio, a juvenile court is authorized to terminate parental rights and to grant permanent custody to a children services agency in several enumerated circumstances. These circumstances include a finding that (1) permanent custody is in a child's best interest, coupled with a finding that (2) the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent. R.C. 2151.414(B)(1)(a); *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14. The burden of proof is on the children services agency. *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, ¶ 14.

{¶ 29} R.C. 2151.414(E) identifies factors for determining whether a child cannot or should not be placed with either parent within a reasonable period of time. If a court finds, by clear and convincing evidence, that any one of the R.C. 2151.414(E) factors exists, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 9. These factors include, among all other relevant factors, the parent's failure continuously and repeatedly to substantially remedy the conditions that caused the child to be placed outside the home; severe chronic mental illness or chemical dependency of the parent that makes the parent unable to provide an adequate permanent home at the present time or, as anticipated, within one year of the

hearing; the parent's abuse or neglect of the child; the parent's demonstrated lack of commitment toward the child by failing to regularly support, visit, or communicate with the child or by other actions that show an unwillingness to provide an adequate permanent home for the child; and the parent's unwillingness to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect. R.C. 2151.414(E)(1)-(4), (14). The juvenile court must consider "all relevant evidence" in determining whether a child cannot or should not be placed with a parent within a reasonable period of time. R.C. 2151.414(E).

{¶ 30} R.C. 2151.414(D)(1) directs the juvenile court to consider all relevant factors when determining the best interest of the child, including but not limited to: (a) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (b) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (c) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.[4] *See also In re L.C.* at ¶ 15.

{¶ 31} All of the court's findings must be supported by clear and convincing evidence. R.C. 2151.414(E); *In re J.R.,* 2d Dist. Montgomery No. 21749, 2007-Ohio-

---

[4] None of the factors in R.C. 2151.414(E)(7) through (11) are applicable in this case.

186, ¶ 9.   A juvenile court's decision on termination of parental rights "will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established."   (Citations omitted.)   *In re L.J.*, 2d Dist. Clark No. 2015-CA-85, 2016-Ohio-2658, ¶ 21, citing *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15.

{¶ 32} Furthermore, "issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact."   *In re A.J.S.*, 2d Dist. Miami No. 2007-CA-2, 2007-Ohio-433, ¶ 22.   The "rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."   *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *In re J.Y.*, 2d Dist. Miami No. 2007-CA-35, 2008-Ohio-3485, ¶ 3.

### IV. Permanent Custody to MCCS

{¶ 33} In her first assignment of error, Mother claims that the juvenile court's decision to grant permanent custody of B.R. to MCCS was not in accordance with R.C. 2151.414, was not in B.R.'s best interest, and was against the manifest weight of the evidence.

{¶ 34} The evidence presented at the August 31, 2017 hearing was as follows.

{¶ 35} Thea Tremain, a caseworker with MCCS, initially met Mother in August 2014 and became reacquainted with Mother in January 2015.   In January 2015, MCCS received a referral based on allegations that Mother had been arrested on a menacing

warrant involving Father's girlfriend's teenaged daughter. B.R. was placed on a safety plan with Grandmother.[5] At that time, MCCS had concerns regarding Mother's housing stability, medical care for her children, her incarceration, and mental health concerns. B.R. was adjudicated dependent on August 20, 2015. B.R. remained with Grandmother until August 2016.

{¶ 36} In August 2016, Grandmother took B.R. to St. Louis, where Mother was living, and Mother reported to Tremain that she (Mother) was unable to care for the child. Tremain requested that Mother return B.R., and Mother placed B.R. with Lacey. In October 2016, B.R. was placed on a safety plan with Lacey.

{¶ 37} Tremain testified that B.R. remained with Lacey until June 2017. Tremain explained that B.R. had behavior issues from the start of the placement with Lacey. B.R.'s behaviors progressed from bed-wetting to hitting himself and others to acting out sexually. B.R. was placed in a foster home after June 2017. Tremain reported that B.R. was doing fairly well in the foster home and at school. B.R. had stopped acting out sexually at home; he had some ongoing issues with bed-wetting and was stealing candy and other objects. B.R. was not having significant behavioral issues at school, although his teacher had reported some inattentive behavior. B.R. had an IEP for speech needs.

{¶ 38} Tremain testified that a case plan was created at the beginning of the case with a goal to reunify B.R. with Mother. The case plan had since been amended. Tremain stated that Mother signed the case plan, read her case plan objectives, and agreed to the objectives she was to complete. Tremain indicated that she discussed the

---

[5] B.R. and his younger brother had remained together until B.R. was removed from Lacey's home in June 2017.

case plan objectives "at almost every meeting I had with [Mother]" and that she tried to meet with Mother monthly.

{¶ 39} Mother's case plan objectives were (1) to obtain a mental health assessment and follow the recommendations, (2) to obtain a substance abuse assessment and following the recommendations, (3) to obtain and maintain stable housing, (4) to obtain and maintain income sufficient to support her children, (5) to sign releases of information, (6) to visit her children, and (7) to meet with the caseworker monthly. Mother signed the requested releases, with the exception of a release for South Community.

{¶ 40} Tremain indicated that the mental health assessment was part of the case plan, because "Mother's behavior has been impulsive and erratic throughout the last three years." Referrals were made to South Community throughout the case (2015-2017) and to Eastway (2017). Tremain stated that Mother had not completed the mental health objective. Tremain further testified that referrals were made for an alcohol and drug assessment due to Mother's repeated statements that she used marijuana. Mother reported that she started a Day-Mont intake in 2015, and engaged in services with South Community in 2015 and with Compass Solutions in 2016. Tremain testified that Mother was then engaged with South Community for mental health and substance abuse diagnosis; Mother attended therapy one or two times per month.

{¶ 41} On cross-examination by the guardian ad litem (GAL), Tremain testified that Mother reported that she had done an intake with Day-Mont in January or February of 2015 and was assigned to "work with" someone there and a substance abuse group. When Tremain followed up with Mother about Day-Mont, Mother would say that she was

unable to contact of the individual to whom she had been assigned. Mother reported to Tremain that she started a mental health assessment in May 2015, but did not complete it. Mother reported to Tremain that she had an intake with South Community in August 2015 and was diagnosed with bipolar disorder and cannabis dependence; Mother stated that she was prescribed three medications. Mother had services in place until early fall 2015, when Mother lost her health insurance. At that time, Mother said she was no longer seeking services at South Community. Tremain testified that Mother had consistently stated for the past two and one-half years that she did not need or want therapy and did not feel she had a mental health problem.

{¶ 42} Mother reported that she went back to South Community in the winter of 2016, but did not sign a release of information for Tremain. In April 2016, Mother had a therapy intake with Compass Solutions in Youngstown. Mother was in Youngstown for approximately three months. Her next intake was at Our Lady's Inn in January or February 2017 in St. Louis. Mother resumed with South Community after her return to Dayton, and she has completed six sessions of therapy.

{¶ 43} The GAL also asked Tremain about drug screenings. Tremain testified that MCCS did not perform drugs screens on Mother, but Mother reported testing positive for marijuana in January 2017; Mother was pregnant at that time. Mother reported testing negative in August 2017 during prenatal screening.

{¶ 44} Tremain testified that Mother had housing, and that it was safe and appropriate for B.R. Mother had lived at this location since April 2017. Tremain indicated that Mother did not have stable housing at the beginning of the case, and she had lived at several apartments throughout the case. Tremain stated that one of the

reasons MCCS initially got involved was due to reports that Mother was selling her food stamps to stay in motels. Tremain testified that, at the beginning of the case, Mother lived in different apartments for a few months or less; Mother did not always have utilities during that time. Tremain indicated that Mother's residences were usually well kept and tidy, although one residence in spring 2015 was left in very poor condition. In spring and summer of 2016, Mother resided in Youngstown, and then Mother moved to St. Louis, residing at a shelter. Mother returned to Dayton in April 2017 and was in the same apartment at the time of the hearing. Tremain considered Mother's housing requirement to be "ongoing."

{¶ 45} Upon questioning by the GAL, Tremain stated that Mother had discussed numerous plans to move throughout the case. Mother expressed her desire to move to other parts of Ohio, particularly Sardinia, and mentioned moving as recently as the week before the hearing. Mother stated that she was thinking of leaving the county or the state to give birth, i.e., away from MCCS. Tremain stated that Mother had periodically stayed in hotels during the course of the case.

{¶ 46} As to Mother's income, Tremain testified that mother reported working full-time at a restaurant since April or May of 2017, which MCCS verified. At the time of the hearing, Mother reported that she was on maternity leave. Tremain was not aware whether the restaurant considered her to be an employee. Tremain stated that Mother had applied for "benefits" but she did not have current income. Tremain stated that Mother had income throughout the case, but she had frequent lapses in her benefits, i.e., she would be sanctioned and lose her medical insurance and food stamps. Tremain considered the income requirement to be "ongoing."

**{¶ 47}** On questioning by the GAL, Tremain stated Mother had not paid child support for her children, to Tremain's knowledge. Mother did provide diapers when her younger child was an infant. Tremain indicated that money was a source of tension between Mother and Grandmother.

**{¶ 48}** In terms of meeting with the caseworker, Tremain testified that Mother was very cooperative at times, but at other times would schedule appointments and no-show. Tremain stated that the missed appointments were "sporadic, depending on what was going on with her life, where she was residing." Tremain indicated that Mother was compliant at that time.

**{¶ 49}** Tremain further discussed Mother's visitation with the children. Initially, visitation was to be agreed upon by Mother and Grandmother. Tremain believed that Mother had sporadic contact with the children in 2015. Mother told Tremain that she would be working or not able to visit or that Grandmother would not allow her to visit or that she did not have transportation. After B.R. was placed with Lacey, Mother did not visit with B.R. between October 2016 and April 2017 and had "very sporadic" phone conversations during that time. Mother was in-and-out of the Dayton area during that time, but did not visit the children when she was in town.

**{¶ 50}** Tremain stated that Mother had visited with B.R. regularly since May 2017. She described B.R. as "withdrawn" and "sad" during recent visitations with Mother. Tremain stated that she observed little interaction between Mother and B.R. and that she had advised Mother to reduce the use of electronic devices during visitation. Tremain stated that Mother seemed unaware of how statements and comments she made may impact B.R., specifically relating to activities she may engage in or her unborn child.

Tremain testified that issues arose after a visitation on May 16, 2017; Lacey and B.R. both reported that Mother told B.R. in the bathroom that he should "hump" other children in the Lacey home. B.R. told Tremain that he had done so. Tremain stated that Mother denied asking B.R. to engage in that conduct.

{¶ 51} Tremain stated that Mother and B.R. were bonded and that B.R. wanted a relationship with Mother. Tremain opined that she did not see a strong bond on Mother's end and that the relationship appeared more sibling-like than parental.

{¶ 52} Tremain stated that she looked into several individuals whom Mother or Father had identified as possible placements for B.R. Tremain indicated that one was not a suitable placement and others were not willing or able to care for B.R. Tremain described B.R. as a "lovable, sweet kid" and believed that he was adoptable, but indicated he was not in a foster-to-adopt home. When asked why MCCS did not believe that B.R. could be reunified with Mother in the foreseeable future, Tremain responded,

> His significant emotional, intellectual, behavioral problems at this point in time, along with his medical issues are not something that [Mother] has shown she's capable of caring for. She doesn't maintain stable housing or income for any period past six months, if that. And she's shown that she's not willing to engage in mental health treatment to address her concerns.

(Tr. at 118.)

{¶ 53} Jessica Lacey (James Lacey's daughter) testified that B.R. stayed in her home from approximately October 2016 until early June 2017. Jessica was an acquaintance of Mother's and she babysat B.R. and his younger brother prior to their placement in her home. When B.R. stayed at Jessica's home, the residents included

Jessica's father James, James's girlfriend, Jessica's fiancée, Jessica's sister, Jessica's four children, B.R., and B.R.'s younger brother.

{¶ 54} Jessica testified that B.R. had a hard time adjusting to living in her home. He was very argumentative, was "touching inappropriately," and wet the bed. B.R. urinated on the couch and on other children's beds. B.R. would make verbal threats of violence against the Laceys and his mother. Some of B.R.'s tantrums were "over the top," and Jessica witnessed B.R. choke, scratch, and bite himself. These behaviors continued during his stay with the Laceys.

{¶ 55} Jessica testified that Mother visited B.R. two or three times while B.R. lived in the Laceys' home, beginning around Easter 2017. Jessica testified that, once Mother started visiting with B.R., B.R.'s behavior became more aggressive and sexual toward other children in the house. Jessica testified that B.R. admitted to her that he had tried to molest her children. When Jessica asked B.R. why he thought his behavior was okay, B.R. said that he acted as he did because his mother told him to do it. B.R. told Jessica that his mother would take him to the restroom at their visit at Children Services and would whisper in his ear and tell him to do sexual things to Jessica's children. At the time, B.R. was 8 years old, and two of Jessica's children were 2 and 7 years old.

{¶ 56} Since April 11, 2017, B.R. had received therapy at SAFY, a therapeutic foster care agency and outpatient mental health facility. His therapist, Jaime Surber, testified that B.R. had been diagnosed with adjustment disorder with mixed disturbance of mood and conduct. She sees B.R. for one hour each week, focusing on trauma, anxiety, and behavioral issues. Surber testified that trauma was an issue for B.R., because he expressed that his being left by his mother at the Laceys' house was very

traumatic to him. B.R. reported that Mother dropped him off, saying that she would be back after work, but she never returned.

{¶ 57} Surber testified that B.R.'s behaviors were a focus, because he was "acting out severely" in the Laceys' home. Surber testified that B.R. discussed his sexualized behaviors with her. B.R. reported that he was "humping" other children; B.R. described in detail one incident where he pulled down another boy's pants, had the boy over a bed, and was bending over the boy humping him. B.R. told Surber that his mother had taken him to the bathroom and that she leaned down and told him to do those things. Surber stated that she had spoken with B.R. about body parts, private parts, and appropriate behaviors; after it was explained, B.R. seemed "embarrassed a little bit about what he had done" and seemed to realize that his behavior was not appropriate.

{¶ 58} B.R. reported to Surber that he would choke himself and bang his head when he was upset. B.R. and Surber discussed an incident where B.R. pulled a butcher knife on another child in the home. B.R. told Surber that he had urinated in the home out of anger, had hit other children, and had thrown dog feces at another child.

{¶ 59} Surber testified that B.R.'s behavior had improved at his new placement and he was not acting out sexually or threatening to kill himself or others, but he was still defiant and had frequent meltdowns. Surber testified that B.R. no longer met the requirements for a conduct disorder. Surber questioned whether B.R. had ADHD; she stated that his behavior could be anxiety-related. Surber believed that B.R. might have some cognitive delays, but none had been diagnosed.

{¶ 60} Surber testified that anxiety was another focus for B.R. She stated that B.R. worried a lot about his mother and was afraid that something would happen to her.

Surber stated that she and B.R. talked a lot about what he could and could not control. During the week before the hearing, Surber noticed that B.R. was "breathing funny" when they were discussing his biggest trauma, i.e., being left by his mother with James Lacey. B.R. also told her that his stomach was upset. Surber worked with B.R. about using deep breathing and counting to ten before he reacts as ways to cope with anxiety. Surber stated that B.R. got upset when discussing Mother, and he made detailed drawings of specific incidents, such as when Mother left him with James Lacey and when Mother was choked by a boyfriend. Surber had concerns that B.R. might have been physically and sexually abused, but B.R. had never disclosed any incidents. Surber did not see signs of anxiety when B.R. was not discussing Mother.

{¶ 61} Surber testified that B.R. saw Mother a couple hours per week. B.R. had reported sadness and anxiety after the visits, but not during the visits. B.R. expressed sadness at not being able to see his brother or to go home with Mother.

{¶ 62} Courtney Price, who had been B.R.'s guardian ad litem since May 2015, also testified. Price testified that she had spoken several times with B.R. According to Price, B.R. talked a lot about how he did not have much food with Mother and that he did not always have a bed of his own or blankets. When B.R. moved to a new location, he was always happy to have a lot of food and a place to sleep. B.R. also had repeatedly stated that Mother was not often there, and Price testified that B.R. appeared to be more bonded with Grandmother, who seemed to parent and raise him. B.R. had stopped asking about Grandmother, but spoke frequently and consistently about Grandmother as the primary caregiver for him and his brother.

{¶ 63} Price testified that she had observed several interactions between B.R.,

Mother, and Grandmother. Price stated that she met B.R. and Grandmother in May 2015, but did not observe Mother with her children for the first year and a half of the case. Mother had court-ordered visitation with B.R. and Price every Sunday at Grandmother's house, but Mother always cancelled. Price stated that Grandmother tried to facilitate visits, offering to take B.R. to different places, but Mother did not take advantage of those offers. Price did not observe Mother with B.R. until an annual review.

{¶ 64} Price stated that Mother attended regular visitations during the two months prior to the hearing. On occasion, Price observed Mother interact "very well" with B.R.; the two would play "Memory" and B.R. laughed and smiled when Mother was around. On other recent visits, Mother and B.R. had very little interaction; B.R. would "stare[ ] at a tablet" or they would go outside and Mother played with B.R.'s brother.

{¶ 65} Price was aware that Mother resided in St. Louis for several months and that she returned to Dayton periodically during that time. Price was not aware of any visits by Mother with B.R. when she was in the Dayton area.

{¶ 66} Price testified that, at the time of the hearing, B.R. was 8 years old and would be turning 9 within a month. B.R. was beginning second grade. She explained that, due to the instability in housing and moving around, B.R. attended kindergarten two or three times. B.R. never attended preschool. Price stated that B.R.'s graduation from kindergarten "was a huge, huge deal to him, and Mother swore she would be there, and I don't believe she attended." Price stated that she had significant concerns that B.R. would not be enrolled in or attending school if Mother were to get custody. Price explained that Mother "does not stay in the same place longer than a couple months, and even geographically, if it's in one city, there are multiple moves." Price testified that B.R.

was on an IEP for speech and there were some concerns about possible cognitive disability; Price stated that the IEP needed to be updated.

{¶ 67} Price stated that Mother had always been very good about getting back to her (Price) and maintaining communication. Price testified that her interactions with Mother always had been "very pleasant" and "positive", but "unrealistic." Mother repeatedly told Price that she did not have any mental health problems, but had reported a historic diagnosis of bipolar disorder and ADHD.

{¶ 68} Price described B.R. as "very cute" and "very sweet," but currently "incredibly sad." Price stated that she had seen him where he's "bouncing off the walls" and where he "is just zoned out"; she described B.R. currently as "zoned out" and "a zombie." Price stated that his speech was difficult to understand, and he was "incredibly withdrawn." She described his decline as recent and sudden, and she believed that the decline was in part due to B.R.'s separation from his younger brother, who was not removed from Lacey's home. B.R. recently talked about wanting to die and to hurt other people.

{¶ 69} Price stated that she had concerns about Mother's resuming custody of B.R. She stated that B.R. had significant special needs. Price was concerned about Mother's "mental health, substance abuse, about basic stability, housing, food, education, medical care." Price indicated that B.R. had to have multiple permanent teeth removed because of decay in his mouth. Price testified that she believed permanent custody to MCCS was in B.R.'s best interest, because she did not believe B.R.'s basic and special needs would be met if he were returned to Mother. She also stated that there had had been an exhaustive search for anyone to take him, and no one could be found.

{¶ 70} Price believed B.R. was adoptable. Price testified on cross-examination that B.R. had always maintained that he would like to live with Mother.

{¶ 71} Mother testified on her own behalf. She stated that she had lived at her current apartment in Dayton since April 11, 2017; she was the sole lessee on a one-year lease. The apartment had two bedrooms, one of which would be B.R.'s. Mother was pregnant at the hearing, and she indicated that the new baby would sleep in her bedroom. Mother had bedding for B.R.

{¶ 72} Mother stated that she was employed at a restaurant, but was on maternity leave; Mother planned to return to work in mid-October 2017. Mother's net income was approximately $360 to $380 every two weeks at the restaurant. Mother stated that child support of approximately $110 ($55 per child) was deducted from her paychecks. Mother was receiving food assistance and had an upcoming hearing in September for cash. Mother testified that she would have food for her children through food assistance.

{¶ 73} Mother testified that she had a mental health assessment in early May and began biweekly appointments on May 31, 2017. Mother stated that she was diagnosed with impulsive disorder, and she was working on coping skills and communication. Mother had not been prescribed medication. Mother stated that, since beginning therapy, she believed that she had been coping better with others, including her caseworker. Mother acknowledged that she had, in the past, expressed that she did not need therapy, but she testified that therapy was helpful. Mother believed that she was currently up to date on her releases.

{¶ 74} Mother testified that her last positive drug test was January 20, 2017. Mother stated that she stopped smoking and social drug use upon learning of her current

pregnancy. Mother stated that her last drug screen was June 20, 2017, and the screening was negative. Mother testified that a drug screen would be negative if she were tested that day.

{¶ 75} Mother was asked about the allegation that she told B.R., while in a bathroom, to act out. Mother denied the incident occurred. Mother stated that she always told B.R. to respect Lacey, because she did not know what would happen if he (Lacey) could not care for B.R. Mother felt that she had good visits with B.R. and tried to bond with him. Mother stated that she started taking a tablet to visitation a few weeks before, because B.R. was no longer interested in the toys. Mother stated that she brought food and occasionally gifts to visitation. Mother asked B.R. what was wrong when he seemed down or quiet during visitation.

{¶ 76} Mother testified that she would do "everything possible" to care for B.R. if custody were returned to her. She stated that she would take B.R. to counseling and any necessary doctor appointments and would be engaged with his school. Mother stated that she wanted B.R. to be able to bond with the new baby. Mother expressed that B.R. was excited about the new baby. Mother stated that, if custody were returned to her, she would reach out to B.R.'s paternal family and to her father (B.R.'s maternal grandfather).

{¶ 77} On cross-examination by MCCS, Mother testified about her compliance with her case plan objectives. She acknowledged that she had mental health assessments in January and May of 2015, but did not follow through. In August 2015, she did an assessment at South Community, which diagnosed her with bipolar disorder, and followed up for a couple months; Mother stated that she had "really no good reason" for

her disengagement. Mother stated that she did an assessment with Compass Solutions in August 2016 and was involved there for three months, until she moved back to Dayton. Mother testified that she sought mental health services in St. Louis and was compliant with those programs. Mother agreed that she was currently being seen at South Community and was compliant with their recommendations.

{¶ 78} Mother repeated on cross-examination that her last positive drug screen was in January 2017, and that she had not used drugs since she learned she was pregnant.

{¶ 79} When asked about her housing, Mother testified that she had had several residences throughout the case. She initially lived in three different apartments in the Dayton area, staying for approximately one month, three months, and three to four months, respectively. Mother resided in Youngstown for approximately four months. Mother moved back to Dayton and then moved to St. Louis. In St. Louis, she resided with a friend from October 2016 to January 2017 and then at a shelter from January 2017 to April 2017. Mother had been in her current apartment since April 2017.

{¶ 80} As for her income, Mother testified that her baby was due on September 12, 2017, and she planned to return to work 4 to 6 weeks after the birth. Mother indicated that she would be promoted when she returned. Mother was positive that the restaurant deducted child support from her paycheck.

{¶ 81} Mother testified that her court-ordered visitation when Grandmother had custody was Sundays from noon to 8:00 p.m. Mother indicated that she visited, however, during different days of the week. Mother did not visit every week, but visited most months for two to three hours per visit. Mother described her visits as "sporadic."

Mother stated that she did not visit B.R. when she lived in St. Louis, and she denied returning to Dayton during that time. Mother again denied that the "bathroom incident" occurred during visitation in May 2017.

{¶ 82} Mother testified that she no longer had plans to move out of Montgomery County. Mother stated that she would use public transportation to get B.R. to any appointments he needed.

{¶ 83} In overruling Mother's objections to the magistrate's grant of permanent custody to MCCS, the juvenile court found that B.R. could not be placed with Mother within a reasonable period of time. The juvenile court reviewed the evidence regarding Mother's case plan objectives and concluded that Mother failed continuously and repeatedly to substantially remedy the conditions causing B.R. to be placed outside the home. *See* R.C. 2151.414(E)(1). Noting that Mother denied that she had mental health or substance abuse issues, the court further found that Mother had a "chronic mental illness, chronic emotional illness, * * * or chemical dependency" that was so severe that she was unable to provide an adequate permanent home for B.R. at the present time and within one year. *See* R.C. 2151.414(E)(2).

{¶ 84} The court further found that Mother demonstrated a lack of commitment to B.R. *See* R.C. 2151.414(E)(4). The court reasoned: "When maternal grandmother had custody of the child, Mother provided little to no support for the child. Mother and Father have both gone months without visiting the child. Moreover, as previously discussed in detail, Mother and Father have failed to address their case plan objectives." Finally, the court concluded that Mother was unwilling to provide food, clothing, shelter, and other basic necessities for B.R. *See* R.C. 2151.414(E)(14). The court highlighted B.R.'s lack

of educational foundation, Mother's failure to attend B.R.'s kindergarten graduation, Mother's frequent moves, B.R.'s speech and possible cognitive disabilities, and B.R.'s lack of dental care.

{¶ 85} Moreover, the juvenile court concluded that permanent custody to MCCS was in B.R.'s best interest. The juvenile court extensively reviewed B.R.'s difficulties in adjusting to the Laceys' home and information about B.R.'s behavior and emotional state throughout the case, as reported by Jessica Lacey, Surber, Tremain, and Price. The juvenile court found that the factor concerning the interrelationships of B.R. with caregivers and family favored granting permanent custody to MCCS. The juvenile court acknowledged that B.R. consistently maintained that he wanted to return to Mother and that he wants to have contact with his sibling. However, the juvenile court found that this factor weighed neither for nor against the granting of permanent custody to MCCS. The juvenile court reviewed B.R.'s custodial history and concluded that the factor weighed in favor of granting permanent custody to MCCS. Additionally, the juvenile court concluded that a legally secure, permanent placement could not be achieved without granting permanent custody to MCCS.

{¶ 86} Finally, the juvenile court concluded that MCCS made reasonable efforts to reunify B.R. with Mother. The court found: "General services provided to the family by MCCS to assist in reunification included case referrals, information, substitute care, transportation and home studies. * * * While a case plan was developed, both Mother and Father made minimal effort in working the case plan."

{¶ 87} Based on the evidence presented, the juvenile court's determinations that B.R. could not be returned to Mother within a reasonable period of time, that permanent

custody to MCCS was in the best interest of B.R., and that MCCS made reasonable efforts to reunify B.R. with Mother were supported by clear and convincing evidence and were not against the manifest weight of the evidence. We find no error in the juvenile court's determination to grant permanent custody of B.R. to MCCS.

{¶ 88} Mother's first assignment of error is overruled.

## V. Conclusion

{¶ 89} The juvenile court's judgment will be affirmed.

. . . . . . . . . . . . .


DONOVAN, J. and HALL, J., concur.


Copies sent to:

Mathias H. Heck
Michael P. Allen
Kelly M. Schroeder
Christopher Fogt
Courtney Price
Andrew Schlueter
Hon. Anthony Capizzi