[Cite as *In re A.N.*, 2019-Ohio-1669.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## GREENE COUNTY

IN THE MATTER OF: A.N., A.N., and
C.N.

:
:
:            Appellate Case No. 2018-CA-44
:
:            Trial Court Case No. N45640
:
:            (Appeal from Common Pleas Court –
:            Juvenile Division)
:
:

. . . . . . . . . . .

# O P I N I O N

Rendered on the 3rd day of May, 2019.

. . . . . . . . . . .

NATHANIEL R. LUKEN, Atty. Reg. No. 0087864, Assistant Prosecuting Attorney, Greene
County Prosecutor's Office, 61 Greene Street, Xenia, Ohio 45385
        Attorney for Appellee, Greene County Children Services

KIRSTEN KNIGHT, Atty. Reg. No. 0080433, P.O. Box 137, Germantown, Ohio 45327
        Attorney for Appellant, Mother

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Mother appeals from a judgment terminating her parental rights over her three children, A.N.1, A.N.2, and C.N. Although Father's parental rights were also terminated, he has not appealed.

{¶ 2} Mother contends that the trial court erred in granting permanent custody to Greene County Children Services ("GCCS"), because GCCS failed to prove by clear and convincing evidence that an award of permanent custody was in the children's best interest. For the reasons discussed below, we find no error on the trial court's part. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 3} Mother and Father have had a very long history with GCCS. On January 20, 2006, GCCS filed an amended complaint regarding A.N.1 (the eldest of the three children), who had been born in late 2005. After an adjudicatory hearing, A.N.1 was adjudicated dependent in May 2006. A.N.1 was left in Mother's custody, and GCCS was given protective supervision.

{¶ 4} A.N.2 was born in late 2008. In June 2009, GCCS filed complaints involving both A.N.1 and A.N.2, and they were adjudicated neglected and dependent based on the parents' drug use and incarceration; GCCS was awarded temporary custody. Later that year, the court ordered the children to be reunified with Mother and Father under the protective supervision of GCCS.

{¶ 5} In 2011, A.N.1 and A.N.2 were in GCCS's care for about three months. C.N. was born in early 2013, and in early 2014, both Mother and Father were incarcerated.

All three children were adjudicated neglected and dependent and were in GCCS's care between June 2014 and September 2015. They were returned to the parents' care at that point because the parents had completed their case plan requirements.

{¶ 6} The problems causing GCCS involvement were drugs, domestic violence, and the parents' incarcerations. In early December 2016, GCCS caseworker Miranda Ray received a call from the Greene County Sheriff's Department, informing her that Mother had been detained and was going to be jailed. At that time, Father was already in the Greene County Jail. The Xenia police had been to the family's apartment and had knocked on the door, but no one answered. Before going to the home, Ray spoke with Mother at the jail. Mother said a friend was watching the children and was likely asleep. Mother also had track marks on her arms and admitted to having used cocaine intravenously.

{¶ 7} When Ray arrived at the home, a teenager was sleeping on the couch, and A.N.1 and A.N.2 were awake. The officer found an adult female (a known drug user) in A.N.1's bedroom, but the female was not aware that she was the only adult in the home. Due to the lack of supervision for the children, given their ages, and Mother's admission of drug use, GCCS concluded that it was in the children's best interest to have the parents sign an agreement for temporary custody. GCCS initially placed the children in their former foster parents' home, but then transferred the children to another foster home, where they lived from early January 2017 until the permanent custody hearings in April 2018.

{¶ 8} In December 2016, GCCS filed a complaint seeking permanent custody of the children. While the original case plan goal was adoption due to the permanent

custody request, GCCS also tried to implement a case plan so the parents could work on reunification. This was unsuccessful. Mother was on the case plan from December 2016 to May 2017. Under the plan, Mother was required to obtain a mental health and substance abuse assessment, submit to random drug screens, sign releases of information, obtain stable living conditions, and engage in a parenting assessment with Dr. Bromberg.

{¶ 9} Father's case plan goals were to obtain a mental health and substance abuse assessment, to sign releases of information, obtain a stable home, follow the recommendations from the assessments, and engage in visitation with his children. Both parties were evaluated in February 2017 by Dr. Bromberg, and after GCCS received his recommendations, they were added to the case plan. While the parents made some attempts to comply, such as attending the psychological assessment and submitting to drug screens, they were unsuccessful in seeking or completing drug and mental health treatment, in visiting their children, and in obtaining stable living conditions.

{¶ 10} In June 2017, GCCS filed a new complaint and dismissed the original complaint. In the complaint filed on June 5, 2017, GCCS alleged that the children were neglected because they lacked adequate parental care due to the parents' faults or habits, and because the parents neglected the children or refused to provide proper or necessary subsistence. The complaint further alleged that the children were dependent because they lacked adequate parental care due to the mental or physical condition of the children's parents, and because the children's condition or environment warranted the state, in the children's interests, to assume their guardianship. The complaint asked for permanent custody of the children, or in the alternative, temporary custody.

{¶ 11} By that point, Mother had been sentenced to one year in prison (beginning in May 2017), and had been removed from the case plan. Mother was released from prison in September 2017 and was sent to a halfway house in Cincinnati, Ohio. Due to a curfew violation, Mother was returned to prison from the halfway house in January 2018 and was then released from prison in February 2018.

{¶ 12} When the original complaint was filed, Father was in jail. After being released in January 2017, Father participated to some extent. However, he was subsequently arrested for drug possession on June 17, 2017, and was arrested again in late December 2017, on felony drug charges. At the time of trial in April 2018, Father was still in jail due to the pending December charges, which could potentially result in a prison term of 20 to 30 years. Father had previously been removed from the case plan in October 2017; Mother was added at that time, and was allowed to have phone contact with the children twice a week.

{¶ 13} Previously, in June 2017, the trial court filed an order indicating that Mother and Father had agreed to various matters. Mother was to complete an alcohol and other drug (AOD) assessment and follow the recommendations and submit to random drug screens. Father was to be reassessed for alcohol and drug services and follow recommendations, and submit to drug screens. GCCS was also granted interim temporary custody.

{¶ 14} The adjudication hearing was held on July 17, 2017, and the parties stipulated (and the court found) that the children were neglected and dependent. In an agreed entry filed in late September, 2017, the court granted temporary custody of the children to GCCS. The parties stipulated that GCCS had made reasonable efforts to

maintain the children in the home or with relative placement, had made referrals for visitation for the parents, and referrals for treatment for Mother. In addition, GCCS had made reasonable effort to prevent removal, to eliminate continued removal, and to make it possible for the children to return home. The court had also conducted an in camera interview with two of the children. The entry stipulated that the children could not be placed with Mother because she was incarcerated, and that Father had not completed all his case plan objectives.

{¶ 15} As noted, Mother was added back to the case plan in early October 2017. She was also referred to the visitation center for supervised visits. However, Mother never appeared for orientation, and the visitation center was unable to set up visits. The visitation center, therefore, closed its case in early December 2017. GCCS then filed an amended case plan on December 7, 2017, for the purpose of removing face-to-face visits with Mother. On December 8, 2017, GCCS filed a motion to convert temporary custody to permanent custody, based on R.C. 2151.414(B)(1)(a), (c), and (e).

{¶ 16} On April 4 and 5, 2018, the trial court held hearings on permanent custody. The court then filed a judgment entry on November 6, 2018. After making extensive findings of fact, the court concluded that the children could not be placed with either parent within a reasonable time, that A.N.1 had been adjudicated neglected or dependent at least three times, and that Father had abandoned the children. The court further concluded that the children's best interests would be served by granting permanent custody to GCCS. Mother appealed from the judgment of the trial court, but Father did not appeal.

## II. The Best Interests of the Children

{¶ 17} In a single assignment of error, Mother states that:

The Trial Court Erred in Granting Permanent Custody to Greene County Children's Services Because That Agency Failed to Prove By Clear and Convincing Evidence That Permanent Custody Was in the Best Interest of the Minor Children.

{¶ 18} According to Mother, the trial court erred in awarding GCCS permanent custody because Mother had completed significant requirements of her case plan, and two extensions of temporary custody were still available. Mother argues that she had completed a drug and alcohol assessment, a parenting and psychological assessment, a drug treatment class, and a parenting class, and had successfully completed her case plan in a prior case.

{¶ 19} Parents have essential and basic rights to conceive and raise children, but these fundamental rights are not absolute. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 39-40; *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11. In particular, "the government has broad authority to intervene to protect children from abuse and neglect." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28, citing R.C. 2151.01.

{¶ 20} "In a proceeding for the termination of parental rights, all the court's findings must be supported by clear and convincing evidence." *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7, citing R.C. 2151.414(E). (Other citation omitted.) The Supreme Court of Ohio defines "clear and convincing evidence" as " 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to

the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *In re K.H.* at ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 21} However, decisions on terminating parental rights "will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted). *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. We review the court's judgment on this matter for abuse of discretion. *See In re C.F.* at ¶ 48 (applying an abuse-of-discretion standard to the trial court's findings under R.C. 2151.414).

{¶ 22} An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). Decisions are unreasonable if no sound reasoning supports the decision. *Id.*

{¶ 23} Mother is not challenging the trial court's findings under R.C. 2151.414(B). As pertinent to Mother, the court found that the children could not be returned to her within a reasonable time, and that a child in Mother's custody (A.N.1) had been adjudicated

neglected or dependent at least three times.   *See* R.C. 2151.414(B)(1)(a) and (e).

Thus, the only issue is whether permanent custody was in the children's best interests.

**{¶ 24}** Regarding a child's best interest, "R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable."   *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 15.   "No one element is given greater weight or heightened significance."   *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.   To evaluate the trial court's decision, we will consider these factors.


A.   Interaction and Interrelationship of Children with Parents and Foster Parents

**{¶ 25}** In its findings of fact, the trial court noted that the children had lived continuously in the foster parents' home since they were placed (in January 2017), that the children had developed a bond with the foster parents, and that they had been assimilated into their home.   The foster parents also wished to adopt the children if the

court granted GCCS permanent custody.   November 6, 2018 Judgment Entry, Doc., p. 191.[1]

{¶ 26} As to the children's bond with the parents, the foster father indicated that the children did not ask about their parents.   The GCCS caseworker, Ray, also said that she told the children they could write to their parents at any time.   However, they did not want to write to the parents and did not give her any letters.   *Id.* at p. 192.   Both the caseworker and the guardian ad litem ("GAL") testified that the children were happy in the foster home and had developed a bond with the foster parents.

{¶ 27} While there is no doubt that the parents loved their children, they failed to exercise their visitation rights during times they had a chance to do so.   After canceling one orientation appointment and "no-showing" for another in December 2016, Mother attended an orientation session on January 3, 2017, where she was noted to be under the influence of alcohol or drugs.   Mother consistently nodded off during the orientation and had "difficulty remembering the date, signing forms, and recalling information." State's Ex. G, Family Summary Sheet, p. 2.   Mother then attended a visit on January 29, 2017, and one on February 5, 2017.   *Id.* at pp. 2-3.   She did not thereafter attend any visits.

{¶ 28} On January 31, 2017, the police responded to the family's home because Mother had overdosed on heroin.   Mother was then arrested on February 10, 2017 for a probation violation.   In May 2017, Mother was also sentenced to one year in prison for a

---

[1] The clerk did not separately number the docket entries; instead, each page in the docket is numbered.   For example, the November 6, 2018 Judgment Entry consists of pages numbered from 186-195.   When we refer to the docket, we will use the page numbers that the clerk has used.

theft that had occurred in December 2016. At the hearing on April 5, 2018, Mother stated that she had not seen the children since July 26, 2017. Transcript ("Tr."), p. 341.[2] Mother also did not visit the children after she was released from prison in September 2017. Although she was given the opportunity to schedule visitation, she failed to do so. The trial court noted this fact. Doc. at p. 191.

{¶ 29} These facts weighed heavily in favor of granting permanent custody to GCCS.

## B. The Children's Wishes

{¶ 30} The GAL in this case had also been the guardian ad litem in the 2014 case and had a long relationship with the children. In addition, she interviewed the children in camera during the case. In a February 5, 2018 report that responded to the court's request for the wishes of the children concerning permanent custody, the GAL stated that the children were happy and wished to stay with their current foster family. Doc. at p. 127.

{¶ 31} These facts favored granting permanent custody to GCCS.

## C. Custodial History

---

[2] This "visit" would have been at a court hearing, because Mother never visited the children at the visitation center after February 5, 2017. Father did visit the children for a brief time, but was put on an attendance watch due to no shows. His visitation at the center was suspended in June 2017 because he appeared to be under the influence when he visited on June 12, 2017. During the visit, Father "nodded off several times and showed signs of 'track marks' on his left and right arm." State's Ex. I, Family Summary Sheet p. 4. Father did not thereafter visit the children or attempt to have his visitation reinstated.

{¶ 32} Notably, this case did not arise in a vacuum. As indicated, Mother and Father had a long and extensive history with GCCS, and the same caseworker, Ray, had been the caseworker for the prior case that began in May 2014. The trial court noted that it was "troubled by the fact that GCCS was involved in [A.N.1's] life in 2009, as shown in State's Ex. A." Doc. at p. 194. The court went on to stress that:

Continued GCCS involvement in a child's life is detrimental to a child's well-being and shows a pattern of behavior which is harmful to the children. Testimony at this Permanent Custody Hearing was strong evidence that harmful behaviors by the Parents has continued during the present case.

*Id.*

{¶ 33} The record supports the trial court's concern. Recurring issues in the parents' lives were drug problems, criminal problems, and domestic violence, which in turn, resulted in agency involvement. Before moving to Ohio, the parents had previously lost custody of an older son who had testified positive for drugs at birth. June 5, 2017 Complaint, Doc. at p. 4. After they came to Ohio, A.N.1 was adjudicated dependent in 2006 in Greene County Juvenile Court. That case began shortly after A.N.1's birth in 2005. *See* State's Ex. A (A.N.1 was born in late December 2005, and GCCS fled an amended complaint in the dependency action on January 20, 2006).

{¶ 34} In the 2009 Greene County case, which resulted in substantiation of neglect, Mother and Father had been charged with theft for stealing a computer, and Father had also just been released from prison after being arrested three times for domestic violence. In addition, drug use was suspected. Doc. at p. 4. As noted, the children were also in GCCS custody in 2014 and 2015. That case began when Mother

and Father were both incarcerated. *Id.* at p. 5. Drug abuse was also involved in that case. Tr. at p. 145.

{¶ 35} In September 2016, Father was incarcerated for a probation violation after he had overdosed on heroin; he was still in jail for that violation when this case was initially filed. Doc. at p. 3. The case began when Mother was arrested for a trespassing charge in December 2016, but was suspected of having driven a "getaway van" in a drive-by shooting. *Id.* When Ray visited Mother in jail, Mother admitted that she had "relapsed" over the weekend and had used cocaine intravenously. *Id.*

{¶ 36} During the case, the parents continued to use drugs and were incarcerated at various times. Mother overdosed on heroin in January 2017. Doc. at p. 3. She was then either in prison or confined in a halfway house from May 2017 through February 2018. Shortly after Mother's release from prison, Ray met with Mother. This was on March 23, 2018, or only a few weeks before the permanent custody hearing. At that time, Mother submitted to a drug screen and said she would be positive for methamphetamine; Mother also said she had been doing bath salts. Tr. at p. 218.

{¶ 37} According to Ray, Mother's demeanor during this meeting was erratic and very concerning. Mother acted different than she normally had: she could not sit still, was not making a lot of sense, and said things like she did not have a good grip on reality. Mother was also obsessed with the idea of receiving subliminal messaging through her phone and social media. *Id.* at pp. 218-219. Then, on March 26, 2018, Mother called Ray and said that she was in the hospital in Columbus, Ohio, was having hallucinations, and had been placed on a 72-hour hold. *Id.* at p. 228.

{¶ 38} Although Father has not appealed, we note that he also continued with drug

and illegal activity during the case. In February 2017, Father tested positive for methamphetamine and was arrested for a probation violation. In April 2017, Father overdosed and was given Narcan. Doc. at p. 3. Father also admitted to Ray on May 5 and 31, 2017, that if he were drug tested, he would test positive for methamphetamine. *Id.*

{¶ 39} In addition, Father's visitation was suspended in June 2017 due to a suspicion that he was under the influence, and he was arrested shortly thereafter for drug possession. Father was also incarcerated from December 2017 through the hearings in April 2018 on felony drug charges.

{¶ 40} Finally, the GAL and Ray both indicated that the children were doing well in their foster home, better than they had done previously in the 2014-2015 case. Accordingly, there was ample evidence in the record to support the trial court's conclusions. This factor, therefore, heavily weighed in favor of granting permanent custody to GCCS.

### D. The Need for a Legally Secure Placement

{¶ 41} With respect to the need for a legally secure placement, the trial court made several observations, including that the parents had not shown the court "that they have made any progress on their case plan, much less substantial progress to receive sober treatment." Doc. at p. 194. The court also stressed that the "children should not have to wait around for a significant portion of their minority while the parents continue to fail in their sobriety and involvements in violations of criminal law." *Id.* In addition, the court commented that neither parent "can provide secure housing for the Children, and their

behaviors leading up to the hearing, as testified by the Caseworker, indicates that they are engaging in behaviors harmful to the children." *Id.*

**{¶ 42}** Again, the record supports the court's conclusions. For example, Dr. Bromberg's report and testimony painted a very bleak picture of the parents' addiction and mental problems and any potential recovery. Dr. Bromberg is a licensed psychologist and met with both parents on February 1, 2017, to conduct psychological assessments. He also observed the parents interacting with their children.

**{¶ 43}** At the time of the evaluation, Mother was 36 years old. According to the history that Mother gave Dr. Bromberg, she began using cocaine at age 23 and continued using it until about a week before the appointment. Mother stated that she was addicted "pretty quickly." State's Ex. E, p. 4. She also said that she began using heroin at age 30, had continued to use up to the present time, and became addicted to it immediately as well.[3] *Id.* Mother described her troubled childhood, including abandonment by her mother at a young age; sexual abuse by her father, who went to jail; being placed into foster care after her father went to jail for abusing her; and being depressed since age 14. *Id.* at p. 3.

**{¶ 44}** Dr. Bromberg gave Mother the Personality Assessment Inventory, a multiple choice test that is the most administered psychological inventory today; the Substance Abuse Screening Inventory, to assess substance abuse disorder; and the Personality Disorder Checklist, which measures extreme personality dysfunction. After giving these tests, he concluded that Mother's drug use was at what he would consider

---

[3] Mother failed to tell Dr. Bromberg that she had overdosed on drugs the day before the appointment. State's Ex. E, p. 4.

"a lethal level." Tr. at p. 25. On this subject, Dr. Bromberg stated that "every day she's alive I think is a blessing, one of the most frightening profiles I have had to look at, and it's almost as if I'm looking at what we call a psychological autopsy." *Id.* As to what he meant by this, Dr. Bromberg said "There are times now that I am looking at people who have died from overdoses, asked to do it by the Court, and * * * then to do a study of that, and this would be an example of what I look at with a lot of people who die." *Id.* at p. 26.

{¶ 45} The doctor also diagnosed Mother as having an impulse control disorder, post-traumatic stress disorder, and a personality disorder, with a number of features, including "borderline narcissistic, anti-social, avoidant and dependent." *Id.* at p. 27. He also discussed her score on the Global Assessment of Functioning scale, which measures psychological impairment. A score of 50 represents serious or marked psychological impairment, and any number under 40 suggests that an individual would need day-to-day assistance to function. Mother's score was a 30, which is a score that Dr. Bromberg rarely gave. *Id.* at pp. 30-31. Based on his evaluation, Dr. Bromberg concluded that Mother had a high risk for substance abuse for the remainder of her life, even with treatment. State's Ex. E at p. 16.

{¶ 46} Dr. Bromberg made various recommendations, including: immediate inpatient drug treatment for at least one year (which he noted was probably not financially realistic), or inpatient treatment for at least 30-90 days; weekly outpatient drug treatment for at least two years; random drug testing for at least two years; active participation in 12-step substance abuse recovery support groups for 24 months; Dialectical Behavior Therapy (a specialized treatment for personality disorders) for at least 24 months; cognitive behavior therapy weekly for 24 months; individual psychotherapy weekly for 24

months with a therapist specializing in PTSD; participation in Artemis (a victim abuse program) weekly for 12 months; appropriate psychotropic medication; and parenting skills training for 24 months.   State's Ex. E at p. 12; Tr. at pp. 35-39.

**{¶ 47}** Regarding the parenting training, Dr. Bromberg indicated that while 24 months was a long time, Mother had the potential to be unavailable and neglectful to her children because she was dangerous to herself, with a lot of passive suicidal elements, "[a]nd then in the process, she would be dangerous to obviously kids, because she can hardly keep herself alive."   Tr. at p. 40.

**{¶ 48}** Dr. Bromberg gave Father the same tests, and concluded that Mother and Father had very similar profiles.   Father was "[j]ust as disordered abuse wise, the same substances basically, the same lethality."   *Id.* at p. 44.

**{¶ 49}** Mother testified that she had some outpatient drug treatment in prison, intensive outpatient treatment while at the halfway house, and a family violence class. She offered no proof, and never provided the caseworker with any certificates of completion.   Tr. at pp. 217-218.   At trial, Mother said she had misplaced her prison certificates and could not find them.   Nonetheless, despite this alleged treatment, Mother relapsed in the short time she had been out of prison.   On March 23, 2018, Mother told Ray that she would test positive for methamphetamines and that she had been using bath salts.   *Id.* at p. 218.   Furthermore, the trial court ordered Mother to be drug-tested on April 4, 2018 (the day of the first permanent custody hearing).   At that time, Mother tested positive for amphetamines.   Doc. at p. 193.

**{¶ 50}** Ray, who had worked with the family since 2014, testified that she had no optimism that Mother could be in a position to care for the children if she were on a case

plan, because Mother had no motivation to have a long-term sobriety plan. After mentioning Mother's call about hallucinations and being on a 72-hour hold in Columbus, Ray stressed that Mother's health had "declined significantly from not just 2014, but from the beginning of this case, in 2016." Tr. at pp. 228-229.

{¶ 51} Finally, there were no available relatives who could take custody. Mother's aunt, who lived in North Carolina, contacted GCCS, but North Carolina denied a home study request. *Id.* at p. 236. Mother's brother, who lived in Virginia, also contacted the agency, but after saying he would call back in six months, never contacted Ray. *Id.* at p. 237.

{¶ 52} In view of these facts, there is ample evidence supporting the fact that the children needed a legally secure placement and that the parents could not provide it. Furthermore, based on the lack of progress throughout the history of the case, there was no indication that a second extension of temporary custody would have had any effect. This factor, therefore, weighed in favor of granting permanent custody to GCCS.

E. Factors in R.C. 2151.414(E)(7) through (11)

{¶ 53} R.C. 2151.414(E) contains a list of factors that require a court to "enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." As pertinent here, the trial court found that Father had abandoned the children. R.C. 2151.414(E)(10). This finding is not relevant in connection with Mother's appeal, although it obviously reinforces the fact that the trial court properly granted permanent custody to GCCS.

{¶ 54} Based on the preceding discussion, the trial court did not err or abuse its

discretion in granting permanent custody of the children to GCCS. Accordingly, Mother's sole assignment of error is overruled.

### III. Conclusion

**{¶ 55}** Mother's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies sent to:

Nathaniel R. Luken
Kirsten Knight
Daniel Getty
Randall Stevenson
Laura Grissett
Hon. Michael Brady