[Cite as *In re E.D.*, 2014-Ohio-4600.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

IN RE: E.D.                                    :

                                               :        C.A. CASE NO.    26261

                                               :        T.C. NO.    2012-8997

                                               :        (Civil appeal from Common
                                                         Pleas    Court,    Juvenile
Division)

                                               :

                                               :

                                      . . . . . . . . . .

                                  **O P I N I O N**

                    Rendered on the ____17th____ day of _____October_____,
2014.

                                      . . . . . . . . . .

CARLEY J. INGRAM, Atty. Reg. No. 0020084 and TIFFANY C. ALLEN, Atty. Reg.
No. 0089369, Assistant Prosecuting Attorneys, 301 W. Third Street, 5th Floor,
Dayton, Ohio 45422
        Attorneys for Appellee Montgomery County Children Services

MARSHALL G. LACHMAN, Atty. Reg. No. 0076791, 75 North Pioneer Blvd.,
Springboro, Ohio 45066
        Attorney for Appellant Mother

PAULA GOOD, 380 W. Second Street, Dayton, Ohio 45422
        Guardian Ad Litem

                                      . . . . . . . . . .

FROELICH, P.J.

{¶ 1}    Mother appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which granted permanent custody of her daughter, E.D., to Montgomery County Children Services ("MCCS").   For the following reasons, the judgment of the trial court will be affirmed.   E.D.'s paternity has not been established, and her father is not a party to this action.

{¶ 2}    E.D. was born, prematurely, in October 2012; she remained in the hospital for over two months due to medical issues related to her prematurity and a heart condition.   During this period, Mother visited approximately ten times and did not learn to manage E.D.'s medical needs; the hospital staff contacted MCCS prior to E.D.'s release due to concerns over Mother's ability to care for the child at home.  MCCS obtained interim temporary custody in January 2013, and E.D. was placed in foster care.   E.D. was adjudicated to be dependent in February 2013, and temporary custody was awarded to MCCS in April 2013.   A case plan was developed with several objectives focused on reunification of E.D. with her mother.

{¶ 3}    In November 2013, MCCS filed a motion for permanent custody of E.D.; the supporting affidavit stated that permanent custody was in E.D.'s best interest because of her medical needs, coupled with Mother's failure to complete any of her case plan objectives and to obtain the services recommended for her. The magistrate conducted a hearing on January 22, 2014, and filed a decision recommending that permanent custody be granted to MCCS.   Mother filed objections to the magistrate's decision.   On May 20, 2014, the trial court overruled Mother's objections and granted MCCS's motion for permanent custody.

{¶ 4} Mother appeals from the trial court's judgment, raising one assignment of error.

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF E.D. TO [MCCS] AS [MCCS] FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT SUCH A DISPOSITION WAS IN THE BEST INTEREST OF THE CHILD.

{¶ 5} Mother contends that MCCS failed to prove that it was in E.D.'s best interest to grant it permanent custody. She contends that reasonable efforts were not made to reunify the child with Mother, and that E.D. could have been placed with her maternal grandmother, Angela.

{¶ 6} The United States Supreme Court has recognized that parents' interest in the care, custody, and control of their children "is perhaps the oldest of the fundamental liberty interests recognized" by the court. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Parents who are suitable persons have a "paramount" right to the custody of their minor children. *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977).

{¶ 7} In a proceeding for the termination of parental rights, all the court's findings must be supported by clear and convincing evidence. R.C. 2151.414(E); *In re J.R.*, 2d Dist. Montgomery No. 21749, 2007-Ohio-186, ¶ 9. However, the court's decision to terminate parental rights will not be overturned if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established. *In re Forrest S.*, 102 Ohio App.3d 338,

344-345, 657 N.E.2d 307(6th Dist.1995). We review the trial court's judgment for an abuse of discretion. *See In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 48 (applying abuse-of-discretion standard to trial court's findings under R.C. 2151.414).

**{¶ 8}** As is relevant to this case, R.C. 2151.414(B)(1)(a) states that "the court may grant permanent custody of a child to a movant if the court determines * * *, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody," and that, where the child is not abandoned or orphaned and has not been in the temporary custody of a public children services agency for twelve or more months of a consecutive twenty-two-month period, "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."

**{¶ 9}** R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to "(1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child, * * *; [and] (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(E) identifies factors for determining whether a child cannot or should not be placed

with either parent within a reasonable time. If a court finds, by clear and convincing evidence, that any one of the R.C. 2151.414(E) factors exists, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re H.T. & Z.T.*, 2d Dist. Greene Nos. 10-CA-29, 10-CA-30, 2011-Ohio-1285, ¶ 23; *In re K.B.F.*, 2d Dist. Montgomery No. 24891, 2012-Ohio-1855, ¶ 51. These factors include, among all other relevant factors, the parent's failure continuously and repeatedly to substantially remedy the conditions that caused the child to be placed outside the home, severe chronic mental illness or chemical dependency of the parent that makes the parent unable to provide an adequate permanent home at the present time or, as anticipated, within one year of the hearing, the parent's abuse or neglect of the child, and the parent's demonstrated lack of commitment toward the child by failing to regularly support, visit, or communicate with the child or by other actions that show an unwillingness to provide an adequate permanent home for the child. R.C. 2151.414(E)(1)-(4).

{¶ 10} Consideration of placement of a child with a relative is not a statutory requirement. *In re F.C.*, 2d Dist. Montgomery. No. 23803, 2010-Ohio-3113, ¶ 24. "That possibility is a matter that ought to be considered in connection with the child's interaction and relationship with the child's parents, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child." *Id.*, citing R.C. 2151.414(D)(1)(a) and *In re C.W.,* 2d Dist. Montgomery. No. 20140, 2004-Ohio-2040.

{¶ 11} The following evidence was presented at the hearing:

{¶ 12} Jennifer Reynolds, an early intervention coordinator with Help Me Grow, testified that E.D. was referred to her agency as an infant by the hospital at which she was a patient, due to the child's prematurity of 12 weeks. E.D., who was 15 months old at the time of the hearing, continued to receive services from Help Me Grow at the time of the hearing. According to Reynolds, E.D. faced significant medical challenges and was treated by a cardiologist, an eye doctor, a developmental pediatrician, the "feeding therapy team" at Children's Medical Center, and occupational, physical, and speech therapists. There had been improvement in some areas, such as the tracking of E.D.'s eyes, since birth, but she continued to be symptomatic in other areas, such as stiffness. E.D. was treated at the cerebral palsy clinic, although she did not yet have a definitive diagnosis of cerebral palsy, and had made "outstanding progress."

{¶ 13} According to Reynolds, parents with a child in Help Me Grow are expected to work closely with the agency, doctors, and therapists to develop skills, exercises, daily routines, etc. Although the foster family had been doing this very consistently with E.D., Mother had not attended any appointments with E.D.'s seven specialists. Reynolds reached out to mother, reviewed the agency's service plan with her, and discussed and wrote out strategies, so that Mother could interact with E.D. and help her develop. However, after one month, Reynolds was unable to get in contact with Mother for approximately 6 months, and did not hear from her during that time. Reynolds then successfully contacted Mother by phone, but was unable to set up a visitation appointment. Reynolds' last contact with Mother was in September 2013. Reynolds had been unable to observe mother at visitation with

E.D.

{¶ 14}    Reynolds testified that E.D.'s foster family was meeting her needs, and that Mother may also be able to do so with proper support, but Mother was not in regular contact with Help Me Grow.  Reynolds testified that she had seen the foster family with E.D. 17 times over the course of 15 months; "they adore her" and invest a lot of time in her care. E.D. interacts well and positively with other children in the foster home and is very bonded, especially with the foster mother. According to Reynolds, the foster parents attend all of E.D.'s medical appointments and are "good advocates for her medical needs."

Jill Meitzner, E.D.'s MCCS caseworker, had worked with E.D. and her mother, who was 21 years old, for a year at the time of the hearing.  Meitzner testified that, because of her premature birth, E.D. "had to be on a monitor, and she had acid reflux, so she would spit up and choke."  The hospital contacted MCCS prior to E.D.'s release because Mother had visited the child only ten times in a two-month period, and hospital staff were concerned that Mother was not familiar enough with E.D.'s care to take her home.

{¶ 15}    Meitzner worked with Mother on a case plan, which included: 1) completing parenting classes and being able to practice what she learned; 2) obtaining a mental health assessment and following its recommendations; 3) attending E.D.'s medical appointments and understanding her care; 4) maintaining income and stable housing; and 5) caring for her own medical needs, which included diabetes that had contributed to E.D.'s premature birth.  Based on numerous conversations with Meitzner, Mother seemed to understand the case

plan objectives. Meitzner testified that, "every time we would talk about what needed to be done, [Mother would say] she was going to do it the next week."

{¶ 16} After her first referral for parenting classes, Mother attended only one class. She was later re-referred for the classes by MCCS, but still did not attend. Mother attended only one parenting class during the pendency of the case. Mother also missed appointments with Meitzner and visits with E.D. She was informed of many of E.D.'s medical appointments, but failed to attend any of them, even when E.D.'s foster mother offered to drive Mother to the appointments. E.D.'s maternal grandmother, Angela, with whom Mother was then living, did attend a couple of the medical appointments.

{¶ 17} Mother eventually obtained a mental health assessment at Sojourner's, which showed that she had "a cannabis dependence and depression;" the assessor was concerned that she was "self-medicating" and recommended that she attend weekly sessions and have drug testing done weekly. Mother did not comply with these recommendations.

{¶ 18} Mother also did not obtain steady employment and did not receive any financial benefits that would allow her to support herself or E.D. Meitzner provided referrals to the Job Center and to specific employment opportunities, but Mother failed to follow through. Mother had briefly obtained independent housing (under her mother's name), but there were problems with nonpayment of the electricity and rent, the residence became uninhabitable, and Mother moved in with friends and family. MCCS had difficulty contacting Mother during this period. Mother was living with her mother and had not obtained stable, independent

housing, as required by the case plan.

{¶ 19} At the time of the hearing, Mother had been staying with Angela (her mother) since she (Mother) was shot a few months earlier. Angela's boyfriend and Mother's best friend also lived in the home. Meitzner expressed concern about Angela's boyfriend because, when Mother was a teenager, she had made allegations of voyeurism and sexual contact against the boyfriend, which led to Mother's removal from Angela's home. MCCS's home study on Angela and the boyfriend was not approved, based on Angela's "history of mental health" and the concern of past sexual abuse of Mother by Angela's boyfriend. Meitzner had not been to Angela's home herself, although two visits had been scheduled, because Mother had cancelled the appointments.

{¶ 20} Mother did not visit with E.D. regularly while the child was in foster care. Meitzner testified that she had originally scheduled two two-hour visits with E.D. weekly, but Mother asked to reduce the visitation to one visit per week because "it was hard for her to get to the visits" and she was "overwhelmed"; then she canceled approximately three visits per month, leaving only one visit per month. During a three-month period from August to November 2013, Mother did not visit E.D. at all. Meitzner also testified that E.D. became upset during visits with Mother, which was concerning because of the child's heart condition; Meitzner believed that E.D.'s distress was attributable, in part, to the child's unfamiliarity with Mother due to the infrequency of her visits, and Meitzner encouraged Mother to visit more often. Meitzner believed that Mother was bonded with E.D., because Mother became emotional when she saw the child, but she did not believe that E.D. had

bonded with Mother.

{¶ 21}    Mother did not provide Meitzner with any verification that she was managing her own health issues, as required under the case plan.

{¶ 22}    In sum, Meitzner testified that Mother had not satisfied any of the case plan objectives, and Meitzner remained concerned about Mother's ability to manage E.D.'s health needs.  Mother did not have acceptable housing, had not followed through on mental health recommendations, did not have employment, and had not been consistent with visitation such that the child would be comfortable in her care.  Mother's general lack of follow-through with appointments was also cause for concern, due to E.D.'s medical needs and frequent doctor's appointments.

{¶ 23}    According to Meitzner, E.D. was very bonded with her foster family, especially her foster mother, who spent a great deal of time and energy on her care, comfort, and therapy.  Meitzner testified that the foster mother had "been an advocate for" Mother throughout the case, but "as things have progressed," the foster mother did not want E.D. to leave her care; she wanted to offer E.D. a stable environment by adopting her.  No other relatives were in a position to and/or had offered to take E.D.  Meitzner testified that she did not think Mother's inconsistency in attending appointments with or on behalf of E.D. had improved since the case began or would improve in the foreseeable future, and that it would be in E.D.'s best interests to grant permanent custody to MCCS.

{¶ 24}    Angela, E.D.'s maternal grandmother, reported "sporadic" visits with E.D. at the foster home; she had seen E.D. three times in the course of one year,

although she stated that the foster family permitted her and Mother to visit at any time. Angela stated that she had an interest in raising E.D., but her home study had not been approved. She did not believe the allegation of inappropriate sexual conduct against her boyfriend that had been the cause of (then-teenaged) Mother's removal from her home.

{¶ 25} Mother testified that she was living with Angela at the time of the hearing. She had worked two jobs while pregnant with E.D. – at Arby's and as a janitor at Sinclair Community College – and she had an interview scheduled at Cracker Barrel on the afternoon of the hearing. She admitted to occasionally smoking marijuana, but offered to "quit, though, if need be." Mother stated that she had lost some weight, and she managed her diabetes through Metformin pills, rather than insulin.

{¶ 26} Mother testified that she had "made up" the sexual allegations against her "stepfather" as a teenager because she was "unruly," angry, and jealous of her mother's attention; "he never * * * tried to do anything to me like that." Mother testified that she did not recall any inappropriate sexual condact by her mother's boyfriend, such as "French kissing" or other advances (as she previously alleged), but then stated that nothing like that had happened "since she was younger." She also stated that she "tr[ies] to stay away from him."

{¶ 27} Mother denied that she had requested any reduction in visitation; she testified that visitation was reduced to one day per week at the caseworker's suggestion. Mother testified that she did not feel overwhelmed or scared when her daughter cried during visits, but she did not like to let the crying continue due to the

child's heart condition. Mother admitted that she had not paid any child support and that her visitation with E.D. had not been consistent; she also stated that E.D.'s foster mother had informed her (Mother) of the scheduling of medical appointments, but that she had never gone to an appointment.

{¶ 28} Paula Good, the guardian ad litem, investigated a possible family placement with Mother's aunt.[1] Based on a number of factors, including an impending move, the aunt indicated that it would not be possible for her to take E.D. Good filed a report with the court in March 2013 in which she recommended that E.D. stay in MCCS's temporary custody, because it was in her best interest to do so. She stated at the hearing that she had visited with E.D. at the foster home every month, and that her assessment that placement with MCCS served E.D.'s best interest had not changed; she recommended that MCCS be granted permanent custody of E.D.

{¶ 29} Clear and convincing evidence supported the trial court's conclusion that granting permanent custody to MCCS was in E.D.'s best interest. The caseworker testified that Mother had failed to complete any of her case plan objectives, and Mother acknowledged her failure to satisfy at least several of the objectives. At the time of the hearing, Mother did not have a job or independent housing, she had not completed parenting classes or the recommendations from her mental health assessment, she had not consistently visited with E.D., and she had not attended any of E.D.'s medical appointments or learned how to care for E.D.

**{¶ 30}** Mother's objections and her appellate brief assign blame for the lack of progress on Mother's case plan objectives to MCCS, by asserting that MCCS did not make reasonable efforts to help her, but the record refutes this assertion. The trial court found that MCCS worked toward reunification with the family, that the caseworker met with Mother several times to discuss the case plan objectives, and that Mother was referred to several service providers in relation to the case plan objectives. The trial court reasonably concluded that MCCS had made reasonable efforts at reunification and, implicitly, that Mother's failure to satisfy the objectives was not due to lack of effort on the part of MCCS. Given Mother's minimal progress, if any, toward completing the case plan objectives over the course of one year, the trial court also reasonably concluded that E.D. could not be reunified with Mother within a reasonable time.

**{¶ 31}** Finally, Mother suggests that her mother, Angela, should have been granted custody of E.D., as an alternative to granting permanent custody to MCCS. However, a home study concluded that Angela's home was not an appropriate placement for E.D. Angela's boyfriend, who lived in and owned the home, had been accused of sexual impropriety by Mother when she was a teenager; this incident had led to Mother's removal from the home by MCCS. Although Mother recanted and Angela discredited Mother's prior claims against the boyfriend, these concerns provided a reasonable basis for MCCS's and the trial court's conclusions that placement with Angela was not in E.D.'s best interest.

**{¶ 32}** The assignment of error is overruled.

---

[1]The "aunt" is also referred to in the record as a family friend.

**{¶ 33}** The judgment of the trial court will be affirmed.

. . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Carley J. Ingram
Tiffany C. Allen
Marshall G. Lachman
Paula Good
Hon. Anthony Capizzi