[Cite as *In re J.Y.*, 2021-Ohio-2126.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## GREENE COUNTY

| | |
|---|---|
| IN THE MATTER OF: J.Y. | : |
| | : |
| | :     Appellate Case No. 2021-CA-4 |
| | : |
| | :     Trial Court Case No. N49238 |
| | : |
| | :     (Appeal from Common Pleas Court- |
| | :     Juvenile Division) |
| | : |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on the 25th day of June, 2021.

. . . . . . . . . . .

MARCY A. VONDERWELL, Atty. Reg. No. 0078311, Assistant Prosecuting Attorney, Greene County Prosecutor's Office, 61 Greene Street, Suite 200, Xenia, Ohio 45385
    Attorney for Appellee, Greene County Children Services

KELLY M. SCHROEDER, Atty. Reg. No. 0080637, 1 South Main Street, Suite 1800, Dayton, Ohio 45402
    Attorney for Appellant, Mother

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Mother appeals from a judgment of the Greene County Court of Common Pleas, Juvenile Division, which terminated her parental rights and granted permanent custody of her daughter, J.Y., to Greene County Children Services ("GCCS"). For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} Mother has five children, one of which is J.Y., who is currently eight years old. On October 16, 2018, when J.Y. was five years old, GCCS filed a neglect and dependency complaint and motion for interim custody of J.Y. The complaint and motion contained several allegations, including that J.Y.'s father ("Father") choked one of J.Y.'s older siblings. It was also alleged that Mother had recently married a sex offender, C.B., who had been convicted of raping a juvenile victim. Although C.B. was not permitted to have contact with children, it was alleged that Mother's children shared a bed with C.B. at a Super 8 Motel. It was further alleged that GCCS obtained a "family" photograph of C.B. sticking his tongue out and touching it on the forehead of one of J.Y.'s siblings.

{¶ 3} The complaint and motion also contained allegations of Mother's sleeping in a van with all five of her children and Mother's leaving J.Y.'s one-year-old sibling in a vehicle for 30 minutes at a Kroger parking lot. It was also alleged that the condition of Mother's home had been consistently poor and that Mother had a pattern of neglecting to supervise her children and an inability to make safe decisions for her children. It was further alleged that Mother and her children had been involved in 14 prior children services investigations and had several open investigations with GCCS. The complaint noted that a recently-closed investigation involved allegations of Mother using corporal

punishment on one of her children and Mother engaging in possible drug activity.

{¶ 4} On October 31, 2018, the trial court granted GCCS interim custody of J.Y. Thereafter, the trial court held an adjudication hearing on the neglect and dependency complaint. Following the adjudication hearing, the trial court adjudicated J.Y. a neglected and dependent child on November 16, 2018. After the adjudication, the trial court held a disposition hearing. At the disposition hearing, Mother and Father agreed that it was in J.Y.'s best interest to follow GCCS's recommendation for GCCS to obtain temporary custody of J.Y. The trial court thereafter granted GCCS temporary custody of J.Y. on December 12, 2018.

{¶ 5} Nine months after obtaining temporary custody of J.Y., GCCS filed a motion to extend the temporary custody order so that Mother could complete her case plan objectives and demonstrate her ability to parent J.Y. in a safe, stable environment. On November 13, 2019, the trial court held a hearing on the motion and thereafter granted GCCS's request for an extension of temporary custody.

{¶ 6} Five months after the extension, GCCS filed a motion on April 23, 2020, requesting the trial court to grant GCCS permanent custody of J.Y. In the motion, GCCS alleged that Mother's visitation with J.Y. had not been consistent due to J.Y.'s refusing visits with Mother. GCCS also alleged that when J.Y. did visit Mother, J.Y. would start to exhibit extreme behaviors.

{¶ 7} The trial court held a permanent custody hearing on October 23, 2020. Mother attended the hearing along with her counsel. Father did not attend the hearing. Following the hearing, the trial court issued a judgment entry on February 8, 2021, terminating Mother and Father's parental rights and awarding GCCS permanent custody

of J.Y. In so holding, the trial court applied R.C. 2151.414 and found that: (1) J.Y. had been in the temporary custody of a public service agency for 12 or more months of a consecutive 22-month period; and 2) granting GCCS permanent custody was in J.Y.'s best interest. Mother now appeals from that decision.

## Assignment of Error

{¶ 8} Under her sole assignment of error, Mother argues that the trial court's decision terminating her parental rights and awarding GCCS permanent custody of J.Y. was erroneous because it was not in J.Y.'s best interest.

{¶ 9} R.C. 2151.414(B)(1) provides a two-part test for courts to apply when determining whether to grant a motion for permanent custody to a public services agency. *In re R.L.*, 2d Dist. Greene Nos. 2013-CA-46, 2013-CA-50, 2014-Ohio-3955, ¶ 7. The statute requires the trial court to find by clear and convincing evidence that: (1) an award of permanent custody to the agency is in the child's best interest; and (2) any one of the factors enumerated in R.C. 2151.414(B)(1)(a)-(e) exist.

{¶ 10} Mother concedes that the second part of the two-part test is satisfied. This is because the factor under R.C. 2151.414(B)(1)(d) applies to J.Y., as J.Y. "has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period." R.C. 2151.414(B)(1)(d). Therefore, Mother is only challenging the trial court's finding that permanent custody in favor of GCCS was in J.Y.'s best interest.

{¶ 11} When making the best-interest determination, R.C. 2151.414(D)(1) requires the trial court to consider all relevant factors, including but not limited to the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and

(e) Whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

R.C. 2151.414(D)(1)(a)-(e).

{¶ 12} The trial court's findings under R.C. 2151.414(D)(1) must be supported by clear and convincing evidence. *In re K.W.*, 2d Dist. Clark No. 2013-CA-107, 2014-Ohio-4606, ¶ 7. The Supreme Court of Ohio has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986).

{¶ 13} "The [trial] court's decision to terminate parental rights * * *will not be overturned * * * if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted). *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. "On review, we give the trial court's final determination 'the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.' " *In the Matter of G.B.*, 2d Dist. Greene No. 2017-CA-30, 2017-Ohio-8759, ¶ 8, quoting *In re Alfrey*, 2d Dist. Clark No. 2001-CA-83, 2003-Ohio-608, ¶ 102. The trial court's decision will not be reversed absent an abuse of discretion. *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48.

{¶ 14} In support of her appeal, Mother claims that the best-interest factors in R.C. 2151.414(D)(1) weigh in favor of her having custody of J.Y. We are, however, limited in our ability to review that issue due to Mother's failing to file a transcript of the permanent custody hearing. Pursuant to App.R. 9(B), it is the appellant's duty to file the transcript or any parts of the transcript that are necessary for evaluating the trial court's decision. *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199, 400 N.E.2d 384 (1980). "This is necessarily so because an appellant bears the burden of showing error by reference to matters in the record." *Id.* at 199, citing *State v. Skaggs*, 53 Ohio St.2d 162, 372 N.E.2d 1355 (1978). Without the filing of a transcript (or a statement of the evidence or proceedings under App.R. 9(C) or an agreed statement under App.R. 9(D)), this court has nothing to pass upon and must presume the validity of the trial court's proceedings

and affirm. *Id.* This means that "we must presume that the trial court acted with regularity and did not abuse its discretion." *Pennington v. Pennington*, 2d Dist. Montgomery No. 19092, 2002 WL 1252173, *2 (June 7, 2002); *Rose Chevrolet, Inc. v. Adams*, 36 Ohio St.3d 17, 21, 520 N.E.2d 564 (1988).

{¶ 15} In making its best-interest determination, the trial court weighed the relevant factors under R.C. 2151.414(D)(1) and made the following findings from the testimony[1] presented at the permanent custody hearing.

*1. Child's Interaction and Interrelationship with Parents, Siblings, and Foster Parents*

{¶ 16} The interrelationship between J.Y. and Mother is detrimental to J.Y. J.Y. expressed to her GCCS caseworker that she did not want to see her biological parents and that she considered her foster parents to be her mother and father. J.Y.'s case manager and mental health counselor at St. Vincent's Family Center testified that J.Y. regressed when her biological family was discussed as being part of her treatment plan. The regression included J.Y.'s defecating and urinating on herself a couple of times a day and exhibiting increased physical aggression toward her peers. After visits with Mother, J.Y. also began undressing herself in class, hoarding food in school, being sexually aggressive with other children, and soiling herself more frequently. The professionals involved in J.Y.'s care correlated these behaviors to the trauma J.Y. experienced while in Mother's care.

---

[1]The trial court's February 8, 2021 judgment entry indicates that the following individuals testified at the permanent custody hearing: Richard Bromberg, Ph.D.; Brooke Gibson, Residential Case Manager; Kristine Gjessing, Mental Health Counselor; Gina VanWinkle, GCCS Case Worker; Foster Father; and Mother.

{¶ 17} Mother's choice of relationships was also a concern because Father was physically abusive toward her children and Mother's current husband was a registered sex offender whose victim was a four-year-old girl. Even after learning of her husband's criminal history, Mother stayed with him and kept her children around him.

{¶ 18} J.Y. has not seen Father for an extended period of time, and neither J.Y. nor Father desire to reunify with one another. J.Y.'s relationship with her siblings is also minimal. When asked about her family, J.Y. could not remember her biological siblings' names.

{¶ 19} The testimony of J.Y.'s foster father ("Foster Father") established that he had been J.Y.'s foster parent for over 16 months. Foster Father testified how he, his wife, and family had addressed J.Y.'s basic and special needs and about the positive progression in J.Y.'s behavior and schooling after she was placed in their care. Foster Father testified that J.Y. made gradual, albeit great strides in her development until she started resuming visits with her biological family. Foster Father testified that he and his wife have considered adopting J.Y. and would like to provide her with a happy childhood and a safe, stable home.

### 2. Wishes of the Child

{¶ 20} J.Y.'s court appointed special advocate/guardian ad litem set forth in her report that J.Y. has stated that she would like to remain to her foster parents' care.

### 3. Custodial History of the Child

{¶ 21} J.Y. was in her Mother's custody until being removed by the court in October

2018, when J.Y. was five years old. J.Y. had little visitation or contact with Father prior to GCCS's involvement.

### 4. Child's Need for Legally Secure Permanent Placement

{¶ 22} The evidence was clear and convincing that a legally secure permanent placement for J.Y. could not be achieved without a grant of permanent custody to GCCS. While Mother had completed case plan objectives identified by GCCS, she had been unable to exemplify what she had learned. This is because Mother had been unable to visit J.Y. due to J.Y.'s regression in her treatment, as well as Mother's own inability to recognize the role she played in the traumas that J.Y. has experienced. If Mother was unable to recognize and accept responsibility for the issues causing J.Y.'s trauma, there were concerns about Mother's ability to protect J.Y., maintain a safe, stable home for J.Y., and address J.Y.'s basic and special needs.

{¶ 23} There was also a lack of parental bond between J.Y. and her biological parents. Mother, Father, and J.Y. all suffered from mental health issues and needed to further engage in treatment. There was no appropriate relative placement for J.Y., and J.Y.'s mental health and treatment needs were triggered and exacerbated by her biological parents. The licensed psychologist who performed a psychological and parenting-risk evaluation on Mother determined that Mother provided defensive, minimized, and understated responses on the evaluation. Given Mother's responses, the licensed psychologist found that it was impossible to rule out major parenting concerns such as child abuse.

{¶ 24} Based on the foregoing findings, the trial court determined that it was in

J.Y.'s best interest to terminate Mother and Father's parental rights and to grant GCCS permanent custody of J.Y. In the absence of a transcript of the permanent custody hearing, we have no basis from which to conclude that the trial court's decision was an abuse of discretion. We also note that Mother's psychological and parenting-risk evaluation was included in the record as State's Exhibit 1. In the evaluation, the licensed psychologist concluded within a reasonable degree of scientific certainty that Mother "presents a high risk of negligence, a high risk of physical abuse, and a high risk of sexual abuse of her children, by her own actions or by the victimization of others, while in her independent care." State's Exhibit 1. Therefore, because the record presented on appeal does not indicate that the trial court's best-interest determination was an abuse of discretion, we find that the trial court did not err by terminating Mother's parental rights and by granting GCCS permanent custody of J.Y.

{¶ 25} Mother's sole assignment of error is overruled.

## Conclusion

{¶ 26} Having overruled Mother's sole assignment of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and HALL, J., concur.

Copies sent to:

Marcy A. Vonderwell
Kelly M. Schroeder
Kimberly Baylor, GAL
John Leahy
Hon. Amy H. Lewis