[Cite as *In re N.S.*, 2023-Ohio-545.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

IN RE: N.S.

:
:
:
:    C.A. No. 29599
:
:    Trial Court Case No. G-2017-006188-
:    0O-0Q
:
:    (Appeal from Common Pleas Court-
:    Juvenile Division)
:

. . . . . . . . . . .

O P I N I O N

Rendered on February 24, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

ROBERT ALAN BRENNER, Attorney for Appellant

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} The biological mother of N.S. ("Mother") appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, granting permanent custody of N.S., a minor, to Montgomery County Children's Services ("MCCS").[1] Mother

---

[1] To protect the identify and privacy of N.S., a minor, we will refer to her by her initials and will refer to her biological relatives as Mother, Father, and Grandmother.

contends that the trial court erred in finding that it was in the best interest of N.S. for permanent custody to be granted to MCCS. For the reasons that follow, we affirm the trial court's judgment.

I.        Facts and Course of Proceedings

{¶ 2} On October 23, 2017, MCCS filed a dependency complaint and requested an interim temporary custody order relating to N.S. The complaint alleged that Mother was in a planned permanent living arrangement of MCCS, Mother had untreated mental health issues and engaged in behaviors that put N.S. at risk, and the alleged father had not established paternity and was not involved with MCCS. On October 24, 2017, the trial court granted interim temporary custody to MCCS.

{¶ 3} On January 12, 2018, the trial court granted temporary custody of N.S. to her maternal aunt, and on March 28, 2019, the trial court granted legal custody to this aunt. But on May 20, 2019, the aunt could no longer care for N.S. and brought her to MCCS, which was granted interim temporary custody of N.S. on that same day. Temporary custody was granted to MCCS on June 24, 2019. On September 21, 2020, the trial court granted the first extension of temporary custody to MCCS.

{¶ 4} MCCS filed a motion for permanent custody on April 1, 2021. Mother filed a motion for legal custody on June 25, 2021. A trial on both motions was set for January 18, 2022. Mother then filed a motion for legal custody to be given to N.S.'s maternal grandmother ("Grandmother") on December 10, 2021. Father filed a motion for legal custody on January 11, 2022.

{¶ 5} A permanent custody hearing on these motions was held on January 18, 2022, before a magistrate. Regina Howell, a caseworker for MCCS, testified that N.S. was born on November 16, 2017, and was dependent at birth. On January 12, 2018, a maternal aunt of N.S. was granted temporary custody of N.S. In May 2019, MCCS filed a motion for temporary custody of N.S. due to the maternal aunt's inability to provide sufficient care. N.S. had been in MCCS's custody since that time. *Id.* at 11-13. Howell had observed N.S. with her foster parents and three foster siblings. They had a good bond, evidenced by how well N.S. interacted with her foster brothers, how she ran to her foster father to give him hugs, and how well she interacted with her foster mother. The foster parents intended to adopt N.S. *Id.* at 14-15, 34. N.S. was developmentally on target and attended therapy to address emotional concerns. She had a speech issue, which would be addressed after she received dental treatment to address the position of her jaw. *Id.* at 15-16.

{¶ 6} Howell then testified regarding the case plan objectives of Mother and Father. Mother's case plan objectives were as follows: obtain and maintain her mental health treatment on a consistent basis, take her medications, complete a drug and alcohol assessment, follow the recommendations of the assessment, undergo random drug screening, maintain her home in a safe and appropriate manner, attend parenting education, and visit consistently with N.S. *Id.* at 16-17. Howell discussed these objectives with Mother several times. At the time of the hearing, Mother had income-based housing but had not verified her income. She had completed some parenting classes but had been referred to more that she had not completed. Mother had not

complied with the random drug testing requirement, had missed some scheduled visits with N.S., and had not made herself available to MCCS. *Id.* at 17-23. Mother had entered mental health treatment and alcohol and drug treatment. *Id.* at 19.

**{¶ 7}** Father's case plan objectives involved undergoing mental health and drug and alcohol assessments, maintaining adequate housing and income, visiting consistently with N.S., and attending parenting education classes. *Id.* at 24. Father's income appeared to be sufficient to support N.S., and his housing was appropriate when Howell visited his home approximately a year before the hearing. But Howell had been unsuccessful in her attempts to visit the home since then. Father had not completed his drug assessment, had not completed his parenting classes, and had refused a random drug screen in January 2021. Further, he had not consistently visited N.S. When he had visited, there was no major interaction between Father and N.S. *Id.* at 24-30. Father had not responded to Howell's letters attempting to contact him. *Id.* at 30. He did speak with Howell and her supervisor a couple of weeks before the custody hearing about his case plan and his desire to gain custody of N.S. *Id.*

**{¶ 8}** Howell also testified regarding MCCS's efforts to find suitable placements for N.S. The maternal aunt of N.S. had not participated in her case plan since she dropped off N.S. to MCCS in 2019. An aunt and uncle in North Carolina removed themselves from consideration. N.S.'s Grandmother withdrew from consideration before the completion of the home study. Since that time, Grandmother had visited N.S. a couple of times. Father was not considered a good candidate, in part because of his domestic violence history. Howell explained that N.S. could not be reunited with her parents soon

because neither parent had completed the case plan and neither had visited with N.S. consistently enough to provide her with emotional support. *Id.* at 30-35. MCCS provided case management, information, referrals, alternative placements, and home studies. *Id.* at 35.

{¶ 9} On cross-examination, Howell testified that Grandmother previously had withdrawn from consideration for custody of N.S., because Grandmother had had to focus on her family. Howell's recent home visit with Grandmother had been okay, but Howell had commitment concerns with Grandmother and believed she only had a minimal established relationship with N.S. Howell acknowledged that Grandmother had a better work situation at the time of the hearing than she had previously and had housing. Howell testified that, although Father had refused a drug screen in January 2021, he had not been asked to take another test since then. Howell stated that Father's past domestic violence allegation involved his former girlfriend. *Id.* at 36-47.

{¶ 10} Grandmother testified that she had withdrawn from consideration for custody of N.S. in 2019 because she had been caring for her mother, who had cancer, and three other children, while working full-time. *Id.* at 54-55. She believed she could handle custody of N.S. at the time of the hearing because her other three kids were in school and she was only working part-time. *Id.* at 55-56. When Mother visited with N.S., Grandmother sometimes would Facetime with Mother and N.S. *Id.* at 57. Grandmother believed her home had plenty of room for N.S. and her three other children. She only earned $600 or $700 bi-weekly as a hairstylist, but she testified that she would seek any other available financial assistance. *Id.* at 59-60. Grandmother planned to

maintain N.S. in any counseling she was then attending. *Id.* at 65. Grandmother had had an up and down relationship with Mother but testified that she would allow Mother to see N.S. if Mother had the proper attitude. *Id.* at 61-62, 66.

{¶ 11} Mother testified and conceded that she was not physically and financially ready to have custody of N.S., but she wanted Grandmother to have custody so that N.S. would stay in the family and Mother would have an opportunity at a second chance. *Id.* at 73. Mother stated that N.S. had had visits with Father, but their bond was not as strong as it was supposed to be. She noted that those visits were confusing for N.S. but that N.S. knew he was her father. *Id.* at 74-75.

{¶ 12} Finally, Father testified that he had decided not to pursue custody of N.S. while Mother had been improving, but now that Mother was struggling, he had decided to pursue custody. *Id.* at 78-79. Father earned approximately $58,000 per year and paid all his bills. His home had two bedrooms and an additional room in the basement. Periodically, he was responsible for housing and visiting with his other children. *Id.* at 80-82. Father testified that the MCCS caseworker had not returned his calls and that he had never been contacted for another random drug test after his refusal to take the first test. *Id.* at 83-84, 87. Father stated that the MCCS caseworker had not communicated with him and that his scheduled visits with N.S. had often been changed without notice. His work as a carpenter made it difficult to accommodate these schedule changes. *Id.* at 87-89. Father testified that he could afford daycare, loved N.S., would give her his undivided attention, and would keep her in counseling. *Id.* at 90-92, 96. But he conceded that he had not participated in a substance abuse or mental health assessment

and had not completed the recommended parenting classes. *Id.* at 92.

**{¶ 13}** Following the hearing, the magistrate granted permanent custody to MCCS. Mother filed objections to the magistrate's decision. On September 22, 2022, the trial court overruled the objections and granted permanent custody of N.S. to MCCS. Mother filed a timely notice of appeal.

II.     The Trial Court Did Not Abuse Its Discretion in Granting Permanent Custody to MCCS

**{¶ 14}** Mother's sole assignment of error states:

> THE JUVENILE COURT ERRED WHEN IT GRANTED PERMANENT CUSTODY OF THE CHILD TO MCJFS.

**{¶ 15}** We will not overturn a juvenile court's decision to terminate parental rights "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citation omitted.) *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7. "We review the trial court's judgment for an abuse of discretion." *Id.*, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48 (applying an abuse of discretion standard to the trial court's findings under R.C. 2151.414).

**{¶ 16}** " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990), quoting *Huffman*

*v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.*

{¶ 17} Further, "[t]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). Specifically, since "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record[,] * * * the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." (Citations omitted.) *Id.* However, this discretion, while broad, is "not absolute" and is guided by statutory language. *Id.*

{¶ 18} R.C. 2151.414 sets out specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 22. The court must find by clear and convincing evidence (1) that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies and (2) that a grant of permanent custody is in the child's best interest. R.C. 2151.414(B)(1). " 'Clear and convincing evidence is that level of proof which would cause the trier of fact to develop a firm belief or conviction as to the facts sought to be proven. * * * An appellate court will not reverse a trial court's determination concerning parental rights and child custody unless the determination is not supported by sufficient evidence to meet the clear and convincing standard of proof.' " (Citations omitted.) *In*

*re A.L.*, 2d Dist. Montgomery No. 26772, 2016-Ohio-423, ¶ 52, quoting *In re Rishforth*, 2d Dist. Montgomery No. 20915, 2005-Ohio-5007, ¶ 11.

**{¶ 19}** Mother contends that granting permanent custody of N.S. to MCCS was not in N.S.'s best interest. Rather, Mother believes it was in the best interest of N.S. to grant custody to Grandmother. Since Mother limits her assignment of error to whether the trial court properly found that a grant of permanent custody to MCCS was in N.S.'s best interest, we will limit our review to this finding made by the trial court.

**{¶ 20}** In deciding a child's best interest, courts analyze factors set forth in R.C. 2151.414(D)(1)(a)-(e). These include, but are not limited to: "1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 15, citing R.C. 2151.414(D).

**{¶ 21}** The factors in R.C. 2151.414(E)(7) through (11), which are referred to in R.C. 2151.414(D)(1)(e), involve a parent's having been convicted of or pleaded guilty to specific criminal offenses against the child, the child's sibling or another child who lived in the parent's household; a parent's withholding medical treatment or food from the child;

a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated. There was no evidence presented at the hearing relating to these factors. Therefore, we will focus our review on the best interest factors enumerated in R.C. 2151.414(D)(1)(a)-(d).

{¶ 22} The trial court considered and analyzed each of the best interest factors set forth in R.C. 2151.414(D)(1). The court summarized the evidence presented at the custody hearing, including the testimony of the MCCS caseworker, Mother, Father, and Grandmother. The trial court noted the following concerns expressed by MCCS about placing N.S. with Grandmother:

First, when N.S. was first removed in 2017, Grandmother began the home study process but withdrew in 2019; therefore she has previously demonstrated a lack of commitment to the child. (Tr. 38-40) Additionally, Grandmother has a history with the Agency, including that Mother had been removed from Grandmother's home due to mental health and delinquency issues. (Tr. 38-40) Therefore, the Agency is worried that N.S. would be susceptible to similar issues if placed with Grandmother. (Tr. 38-40) Finally, because Mother's *Motion for Legal Custody* (to Grandmother) was filed just a month prior to the hearing, additional time is needed to complete the home study process and Ms. Howell was unsure if the home study would even be approved given Grandmother's prior involvement with the Agency. (Tr. 40-1)

September 22, 2022 Decision, p. 5.

{¶ 23} At the time of the hearing, N.S. had the most significant bond with her foster parents. Mother and Father were struggling to complete their case plan objectives, including the requirement that they consistently visit with N.S. The trial court also noted that the report of the guardian ad litem indicated that N.S. wished to remain with her foster family. Based on the evidence before it, the trial court found by clear and convincing evidence that permanent custody to MCCS was in N.S.'s best interest.

{¶ 24} We have reviewed the entire record, including the testimony presented at the custody hearing. The evidence relating to the best interest factors in R.C. 2151.414(D)(1) supported the trial court's best interest finding. The record before us contains competent, credible evidence by which the trial court could have formed a firm belief or conviction that the grant of permanent custody to MCCS was in N.S.'s best interest. Therefore, the assignment of error is overruled.

III. Conclusion

{¶ 25} Having overruled the sole assignment of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and EPLEY, J., concur.